# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CT-00355-SCT

*THE ESTATE OF ABNER K. NORTHROP, JR.,*
*ABNER K. NORTHROP, III, ADMINISTRATOR*

*v.*

*DAVIS HUTTO, STANLEY TURNER, MEMORIAL*
*HOSPITAL AT GULFPORT AND THOMAS*
*LETARD, M.D.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 02/19/2007 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | FLOYD J. LOGAN |
| ATTORNEYS FOR APPELLEES: | PATRICIA K. SIMPSON |
| | ROSS DOUGLAS VAUGHN |
| | FREDRICK B. FEENEY |
| | MARGARET P. McARTHUR |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY, FIRST JUDICIAL DISTRICT, IS REINSTATED AND AFFIRMED - 05/21/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.    This medical malpractice case is before this Court on writ of certiorari.   A divided

Court of Appeals reversed a grant of summary judgment in favor of the defendants.

***Northrop v. Hutto***, 2008 Miss. App. LEXIS 352 (Miss. Ct. App. June 10, 2008).  The issue

before the Court is what testimony is required from a medical expert witness to establish a prima facie case sufficient to defeat a motion for summary judgment in a medical-malpractice case. Our body of law requires medical experts to articulate a specific, objectively-determined standard of care. The legal requirement remains unchanged. The plaintiff must establish the existence of a recognized duty to the patient, and a breach of that duty, which results in injury proximately caused by the breach.

¶2. We conclude that the Court of Appeals decision is in conflict with its own prior decisions and the published opinions of this Court. The Court of Appeals majority held that summary judgment was inappropriate because the plaintiff, as nonmovant, should benefit when doubt exists as to whether a fact is at issue. *Northrop*, 2008 Miss. App. LEXIS 352 at *9. However, the first bridge that must be crossed is establishing duty, which is a legal question. If a plaintiff fails to establish an objectively-determined standard of care and attendant breach by competent medical testimony, summary judgment is appropriate.

### FACTS

¶3. The plaintiff, Abner K. Northrop, Jr. ("Northrop"), had a radical prostatectomy at the Memorial Hospital at Gulfport in March 1999. His surgeon was Dr. Ronald Brown ("Dr. Brown"). Anesthesia services were provided by the defendants, Thomas P. Letard, M.D. ("Dr. Letard"), Davis R. Hutto, CRNA[1] ("Hutto"), and Stanley Turner, CRNA ("Turner"). Dr. Letard led the anesthesia team and supervised the two CRNAs. Dr. Letard was in the

---

[1]Hutto and Turner are Certified Registered Nurse Anesthetists ("CRNA") in the employ of the hospital. Dr. Letard is a medical doctor specializing in anesthesiology.

operating room at the beginning of the procedure and left Hutto in attendance after the intubation and induction of Northrop. Turner relieved Hutto near the end of the procedure.

¶4.     Northrop had multiple intravenous catheters ("IVs") in place, including a peripheral IV in each arm and a central line in his neck. All IV lines were in place and functioning when Northrop was brought to the operating room. Northrop's arms were extended at ninety-degree angles from his body, and were taped to arm boards. Northrop's upper body, including his arms, was covered with a Bair Hugger[2] and a blanket. Hutto taped the patient's arms to the boards, placed the Bair Hugger and blanket, and taped the blanket to the boards. The IV site in the left arm was latent during the surgery. The surgery lasted approximately three hours and ten minutes. During this time, among their many other responsibilities, the anesthesia team members were responsible for maintaining the IV lines. The team monitored the function of the IVs by multiple methods, including checking vital signs every five minutes, monitoring the IV drip rate, and monitoring the patient's effective response to IV medications and fluids.

¶5.     Upon completion of the surgery, Turner removed the Bair Hugger and blanket and discovered that the IV in the left arm had extravasated.[3]  Turner removed the IV and informed Dr. Letard. The team called Dr. Alton H. Dauterive ("Dr. Dauterive"), a vascular

---

[2]Bair Huggers are forced-air warming systems used to prevent hypothermia while a patient is under anesthesia and cannot maintain body temperature.

[3]Extravasation is leakage of IV fluid outside the intended vessel and into the surrounding tissue.

surgeon. Dr. Dauterive diagnosed compartment syndrome and performed a fasciotomy[4] on Northrop while he was still under anesthesia. A few days later, Dr. Dauterive closed the incisions. One incision required a skin graft, which was taken from Northrop's thigh. Northrop's arm fully recovered, albeit with some scarring, with full range of motion and all nerves intact.

## PROCEDURAL HISTORY

¶6. Northrop filed suit, alleging medical malpractice, in the Circuit Court of the First Judicial District of Harrison County, against Hutto, Turner, Dr. Letard, and the Memorial Hospital at Gulfport. Upon completion of discovery, the defendants moved for summary judgment. The circuit court granted summary judgment for the defendants, finding that Northrop's expert, Dr. Felipe Urdaneta ("Dr. Urdaneta"), had not articulated a standard of care, nor had he shown that any of the defendants had breached the standard or that any breach was the proximate cause of Northrop's injuries. A divided Court of Appeals reversed the grant of summary judgment and remanded the case to the circuit court. *Id.* at *10. The dissent concluded that Northrop's expert had "failed to establish the standard of care, and even if a standard of care was established, there exists no genuine issue of material fact as to the elements of breach and causation." *Id.* The Court of Appeals denied the defendants' motion for rehearing. *Northrop v. Hutto*, 2008 Miss. App. LEXIS 652 (Miss. Ct. App. Oct.

---

[4]Compartment syndrome is a condition caused by increased fluid pressure in tissues. A fasciotomy is a procedure in which incisions are made to allow for drainage to release pressure.

4

21, 2008). This Court granted the defendants' petitions for certiorari. ***Northrop v. Hutto***,

2009 Miss. LEXIS 54 (Miss. Feb. 3, 2009).

## ANALYSIS

¶7. We consider whether Northrop's expert articulated the required standard of care.

¶8. Our standard of review is de novo, as follows:

> The circuit court's grant of a motion for summary judgment is reviewed by this
> Court de novo. *See **Wilner v. White***, 929 So. 2d 315, 318 (Miss. 2006) . . . .
> In this Court's de novo review, "[t]he evidence must be viewed in the light
> most favorable to the party against whom the motion has been made." ***Daniels
> v. GNB, Inc.***, 629 So. 2d 595, 599 (Miss. 1993) (citation omitted).

***Kilhullen v. Kan. City S. Ry.***, 2009 Miss. LEXIS 87, *15-16 (Miss. Jan. 6, 2009).

**Whether Northrop's expert articulated the required standard of care.**

¶9. To make a prima facie case of medical malpractice, the following elements must be

shown:

> the existence of a duty on the part of the physician to conform to the specific
> standard of conduct, the applicable standard of care, the failure to perform to
> that standard, that the breach of duty by the physician was the proximate cause
> of the plaintiff's injury, and that damages to plaintiff have resulted.

***Barner v. Gorman***, 605 So. 2d 805, 808-09 (Miss. 1992). This Court has stated that the

"general rule is that the negligence of a physician may be established only by expert medical

testimony." ***Palmer v. Biloxi Reg'l Med. Ctr.***, 564 So. 2d 1346, 1355 (Miss. 1990) (quoting

***Cole v. Wiggins***, 487 So. 2d 203, 206 (Miss. 1986)). A physician is under a duty to meet the

national standard of care.

> [G]iven the circumstances of each patient, each physician has a duty to . . .
> treat . . . each patient, with such reasonable diligence, skill, competence, and
> prudence as are practiced by minimally competent physicians in the same
> specialty or general field of practice throughout the United States. . . .

5

*Palmer*, 564 So. 2d at 1354 (citing *Hall v. Hilbun*, 466 So. 2d 856, 873 (Miss. 1985)). *See also Maxwell v. Baptist Mem'l Hosp.-DeSoto, Inc.*, 958 So. 2d 284, 289 (Miss. Ct. App. 2007). The standard articulated must be objective, not subjective. This Court stated in *Hall*, "[e]mphasis is given the proposition that physicians incur civil liability only when the quality of care they render falls below *objectively ascertained* minimally acceptable levels." *Hall*, 466 So. 2d at 871 (emphasis added). *See also Maxwell*, 958 So. 2d at 289 (witness who answered in terms of what he would do as a physician was found not to be articulating an objective standard).

¶10. The success of a plaintiff in establishing a case of medical malpractice rests heavily on the shoulders of the plaintiff's selected medical expert. The expert must articulate an objective standard of care. Excerpts of Dr. Urdaneta's testimony are as follows:

> Q: And you didn't see anything in your review of the chart or the depositions of the parties to indicate that Mr. Northrop was not getting the desired effects of the medications, did you?
> A: Not really.
> . . .
> A: In my opinion, I think it was basically the fact that they did not monitor the IV fluids that were actually given to the patient. They were not looking at the extremity where those IV fluids were being given.
> . . .
> Q: Do you know why the extravasation occurred in this case?
> A: No, I don't know.
> Q: Do you know when it occurred?
> A: No.
> . . .
> A: . . . but it could have happened at any point.
> Q: It could have happened five minutes before they took the curtains down?
> A: Theoretically, yes . . . .
> . . .    Q: And what do you know was given through that left IV in this case?
> A: . . . just basically IV fluids, crystaloids as well as blood.
> . . .
> A: The extravasation, per se, is not proof of negligence, that is correct.

Q: An extravasation can happen suddenly?
A: Yes.
Q: Without warning?
A: Without warning.
. . .
Q: . . . From your review of these records, what about Mr. Northrop's course of this procedure would have alerted a reasonably careful anesthesiologist to the presence of an extravasation?
A: The only -- reviewing the records, from the vital signs there's no way you can tell an extravasation is occurring.
. . .
Q: Is it your contention that the standard of care requires visual monitoring of the actual placement of the IV into the patient's body, wherever it may be, in the extremity or otherwise, throughout the entire case?
A: That's not according -- in other words, the [American Board of Anesthesiology] does not state particular -- that particular mandate. It basically states that you need to be monitoring the cardiovascular, the respiratory, the oxygenation as well as the -- what's the called the end tidal $CO_2$. There's no particular mandate that you need to actually be looking at the extremity, if that's what you're referring.
. . .
A: I don't think there's any particular mandate you have to look at the extremities, but you have to monitor where you're [sic] IV fluids are going .
. . .
. . .
A: . . . I don't think you will find anywhere a treatise or any book or anything that states that you need to be looking . . . at the extremity every so often or any . . . period of time. I'm sorry. But I think you have to monitor your patient globally.
. . .
Q: . . . the standard of care does not specifically require the anesthesiologist to pull up the Bair Warmer [sic] and the warming blanket to look at that site as the case is going on?
A: You will not find a standard that says you need to Bair Hugger [sic] every so often, if that's what you're referring to.
Q: That's what I'm asking you. You would agree that is not the standard of care?
A: That is not the standard of care, correct.
. . .
Q: And would you agree that in those anesthesia cases where the patient's arms are tucked to the side, the peripheral lines are sometimes used?
A: Yes.
. . .

Q: . . . Would you agree that the site where the line goes into the arm is not visible to the anesthesiologist?
A: That's correct.
Q: . . . it would not be possible to view the site . . . .
A: . . . I will not say impossible but it will be a major undertaking to look at the arm where -- the extremity where the IV is.
Q: And it's not routinely done, is it?
A: If the arm is tucked, usually not.
Q: If there's no indication that there's a problem with the anesthesia, you don't go and visually observe the IV site in those cases, do you?
A: That is correct.
. . .
A: . . . if the arms are on the side, they're not part of the sterile field so you actually have access to them.
Q: So, just because you have access to them, you're required to look at them; is that your testimony?
A: I did not say required.
Q: Well, required by the standard of care. No?
A: I don't think there is any standard of care that says if the arms are on the side you need to look at them. I think it's part of the common sense that if you have access to them . . . in my opinion you should actually consider that you can.
. . .
Q: And you've told me that the standard of care does not require a visual observation of the arms out to the side?
A: That's correct.
. . .
Q: . . . the standard of care does not specifically require the person to pull the . . . warming blanket up to look at the site where the IV goes into the hand; correct?
A: Correct.
. . .
Q: . . . you said this standard of care that you're testifying that was breached by these CRNAs is contained in these texts and articles that you have presented to us today?
A: I would not -- they do not specifically say CRNAs should be monitoring anything in particular. . . .
. . .
Q: . . . How often, in your opinion, were the CRNAs supposed to look at the arm during this procedure?
A: I have no specific time. There's no standard or no pattern that you have to actually follow . . . .
. . .

8

Q: So, obviously, Doctor, this would not indicate the standard of care in March of 1999, would it?

A: I don't -- I'm not sure what you mean by describing the standard of care. None of [the documents brought to the deposition] deal with the standard of care. They are all case reports of infiltration, different problems with extravasation. I have not brought anything on the standard of care if that's what you're referring to.

. . .

Q: . . . There is no textbook of anesthesia that says in writing the standard of care requires visual or palpation observation of the fluid actually going into the vein during an ongoing case; that is correct?

A: That is correct.

. . .

¶11. Dr. Urdaneta distinguished a national standard of care from his own preferences and practices in his testimony. He discussed the proper way for an anesthesiologist or CRNA to document blood pressure readings. Excerpts from this part of his testimony include: "The only thing I can tell you is that from personal -- and the way I teach my residents to do it is . . . . But that's personal. That's not universally accepted. That's my personal way of doing it." On another question, he responded, "That's universal. That's a standard, yes." Then he reverted to "But that's, again, not universal. That's the way we do it here at the University of Florida." After acknowledging that a requirement to observe IV sites "might not be written as part of the standard of care," he maintained that an anesthesiology team member should manually and visually check IV insertion sites periodically. When pressed on the meaning of "periodically," he replied, "I cannot -- I mean, it varies. It's so variable. It deals with so many variables. I usually -- I make sure when I put my IVs initially that I don't see any infiltration. But that's just a personal observation. And fortunately, since I deal mostly with cardiac patients, I usually have access to the arm, so I'm always looking . . . ."

9

¶12. When asked to provide documentation of his claims about visual inspection and palpation of IV injection sites, Dr. Urdaneta was unable to do so. He repeatedly said that no such mandate exists as part of the standard of care. He stated, "I don't think you will find anywhere a treatise or book or anything that states . . . that you need to look at the extremity every so often or . . . any period of time." When asked if any of the medical articles and texts he brought to his deposition contained a confirmation of his position, he replied, "they do not specifically say CRNAs should be monitoring anything in particular." He summed up the articles by saying they require constant vigilance.

¶13. The standard of care as posed by Northrop's expert, "constant vigilance," fails to satisfy multiple long-held principles of Mississippi law which have been confirmed repeatedly by holdings of this Court, as well as those of the Court of Appeals. Dr. Urdaneta's personal preference does not establish a national standard of care. *See Barner*, 605 So. 2d at 808-09; *Palmer*, 564 So. 2d at 1354. The requisite standard is objective, not subjective. *See Hall*, 466 So. 2d at 871; *Maxwell*, 958 So. 2d at 289. It is clear that Northrop's expert failed to establish an objective standard of care to make a prima facie case of medical malpractice.

¶14. For the reasons stated, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Circuit Court of the First Judicial District of Harrison County.

¶15. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY, FIRST JUDICIAL DISTRICT, IS REINSTATED AND AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, LAMAR, AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J. CHANDLER, J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, DISSENTING:**

¶16.    Because I am satisfied that Northrop presented evidence of an objective standard of care through a qualified expert witness, namely, the standard of constant vigilance, I dissent from today's judgment. I would affirm the decision of the Court of Appeals and remand this case for trial in the Circuit Court of the First Judicial District of Harrison County.

**GRAVES, P.J., JOINS THIS OPINION.**