BARNES, J„
for the Court:
¶ 1. Tia Saucier filed suit against Dr. Richard Hawkins[1] in Harrison County Circuit Court for dental malpractice. At trial, Saucier offered as her sole expert Dr. Roger Vitter, a prosthodontist.[2] Once Saucier’s case-in-chief was complete, Dr. Hawkins moved for a directed verdict based on Dr. Vitter’s inability to articulate a nationally recognized standard of care applicable to the treatment of Saucier by Dr. Hawkins. The trial court granted the motion, and Saucier now appeals. Finding no error, we affirm.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. Saucier first visited general dentist Dr. Hawkins in Gulfport, Mississippi, in March 2000. The initial consultation sheet indicated the following symptoms: sensitivity to heat, cold, sweets, and biting pressure; bleeding gums when brushing her teeth; bilateral clicking of the jaw and jaw pain; and general dissatisfaction with her teeth and their appearance. Generally, Dr. Hawkins’s initial examination records also noted “initial TMJ,”[3] pain in the left and right ears and jaws, “crepitus,” and “popping.” Over the course of Dr. Hawkins’s treatment of Saucier for two years *1279 and eight months, he evaluated her and performed numerous diagnostic procedures, such as taking radiographs and preparing wax, rubber, and composite models of her teeth. Dr. Hawkins implemented a treatment regimen, which included root canals, restoration of Saucier’s upper teeth with crowns, and rehabilitation of some lower-back teeth with crowns and bridges. Dr. Hawkins’s treatment of Saucier ended in November 2002.
¶ 3. In July 2003, Saucier obtained treatment from Dr. Douglas Tillery, who found accelerated and recurrent decay of her teeth. He explained to her that some of the preexisting crowns would need to be removed and additional crowns installed. Dr. Tillery retreated Saucier’s upper arch. Saucier quit seeing Dr. Tillery in June 2004, when she picked up her dental records, claiming she was “getting conflicting diagnosis for treatment,” and was “unsure of how to proceed.”
¶ 4. In March 2005, Saucier was referred by a general dentist, Dr. James Crouch, to Dr. Vitter of Metairie, Louisiana, for an initial consultation. In a letter to Saucier’s attorney at the time, William Quin, dated June 2005, Dr. Vitter stated that Saucier complained to him of bilateral jaw pain, which worsened with chewing, headaches, earaches, neck pain, and gum soreness. He found that a “[b]rief examination revealed dysfunctional jaw movement and discomfort consistent with some degree of temporomandibular dysfunction.”
¶ 5. In May 2005, Dr. Vitter performed a comprehensive dental and TMJ evaluation. It was his opinion Saucier “had a preexisting temporomandibular dysfunction which was not addressed through accepted conservative treatment prior to undergoing irreversible restorative procedures. Her case is now complicated not only by her pre-existing TMD[4] problem, but the clinically unacceptable dental/restorative treatment.” In the letter, he then listed several issues where he believed treatment was “below the standard of care.” Dr. Vitter proposed a treatment plan for Saucier that would cost approximately $40,000 to $50,000.
¶ 6. In January 2006, Saucier filed suit against Drs. Hawkins and Tillery for independent claims of dental malpractice. In her complaint, she claimed that Dr. Hawkins deviated from the standard of care as follows: (1) “[he] performed irreversible restorative treatment of Saucier, a symptomatic TMJ patient, without providing a diagnosis and conservative therapy prior to definitive restorations”; (2) “[he] fail[ed] to advise Saucier of her periodontal disease and significant bone loss of the maxillary posterior teeth”; (3) “[he] perform[ed] ill-fitting bridgework, including open margins, violation of biologic width, over contoured crowns and poor occlusal stability”; and (4) “[his treatment caused] multiple dental abscesses and [he performed] inadequate root canal therapy.”[5]
¶ 7. In March 2006, Dr. Vitter supplemented his June 2005 findings with a letter to Quin after reviewing Saucier’s dental records from Drs. Hawkins and Tillery. Dr. Vitter reiterated that Dr. Hawkins’s treatment fell below the standard of care regarding “the failure to diagnose or inform the patient regarding her periodontal status,” the “management of her TMJ problem,” and “the quality of the dentistry itself.” However, Dr. Vitter noted that “[b]ecause the ‘evidence’ had been removed by subsequent treatment [by Dr. Tillery], my opinion is only based on the *1280 rapid deteriorization following the restorations as indicated in the records provided.” Thus, Dr. Vitter surmised that it was “difficult to determine the quality of treatment provided by Dr. Hawkins.”
¶ 8. Trial ensued in September 2011. During Saucier’s case-in-chief, Dr. Vitter was offered as her only expert witness,[6] and was accepted by the trial court as an expert in the field of prosthodontics. Saucier’s counsel predominately focused his examination of Dr. Vitter on Dr. Hawkins’s failure to evaluate properly and treat Saucier’s preexisting TMJ symptoms. Dr. Vitter opined several times that Dr. Hawkins’s treatment of Saucier fell below the standard of care. But when asked directly by Saucier’s counsel if there is “a standard of care for patients with TMJ,” Dr. Vitter answered “no.” Later, Saucier’s counsel asked, “Are you also an expert in TMJ dysfunction?”[7] Dr. Vitter answered:
TMJ is not a specialty, and there are ... a number of areas of dentistry that manage TMJ. The oral surgery specialty in dentistry manages the surgical aspect of TMJ. Oral surgeons will operate on the jaw joints. In our prosthodontic training program at LSU and across the country a significant portion of the training of our residents is in TMJ. Approximately 20 percent of the time is spent just in maintaining TMJ, learning about TMJ. It’s part of prosthodontics, but there is no specialty of TMJ. And some of the foremost specialists, if you will, in TMJ that are experts are general dentists, but there’s no specialty. So when you ask me if I’m a specialist in it, no one is.
(Emphasis added.) On cross-examination, the following exchange occurred between Dr. Hawkins’s counsel and Dr. Vitter related to his knowledge of the standard of care for TMJ:
Q. I want to ask you one more thing. I want to clarify something. I think you said it right at the beginning of lead examination. There’s no standard of care for treating patients with TMJ. Is that an accurate statement?
A. Not really. There are a lot of organizations who manage TMJ differently. There is a standard of care that’s taught in university settings and outlined in peer review organizations like the American Academy of Oral Facial Pain, the American Calibration Society, TMJ clinics and universities at UCLA, Florida, LSU, Ohio, Iowa, and so there’s a standard of protocol that is outlined. Is there a standard of care in the private community? Most people that manage TMJ patients will follow that, but I can’t tell you that there [are] not other people who do their own thing for this.
Q. In the United States, to your knowledge, is there a standard of care that’s applicable to general dentistry for treating patients with TMJ/ TMD in the United States?
A. I don’t believe the American Academy of General Dentistry has a substandard on TMJ. I’m not a general dentist so I can’t tell you what those standards are.
¶ 9. At the completion of Saucier’s casein-chief, Dr. Hawkins moved for a directed verdict based on Dr. Vitter’s inability to *1281 articulate a nationally recognized standard of care applicable to the field of general dentistry for TMJ. The trial court granted Dr. Hawkins’s motion. Dr. Hawkins also moved for a directed verdict based upon lack of expert testimony regarding causation.
¶ 10. The trial judge granted the directed verdict because of Saucier’s failure to provide an expert who could articulate a national standard of care in the field of general dentistry for the treatment of Saucier. In making her ruling, the trial judge stated from the bench:
Dr. Vitter testified twice that there is no standard of care for TMJ. He specifically testified that people manage it differently. He did say ... that there is a standard of care that is taught at various universities. He did list two entities that he said have outlined a standard of care and he called them peer review organizations. What he referred to them as was standard of protocols that are outlined. However, ... he voluntarily said in the private community most follow these but others do their oum thing.... [LJater in the cross-examination he was specifically asked whether or not he knew the standard in the United States applicable to general dentistry for treating patients with TMJ. He said he did not believe that the American Academy of General Dentistry had standards on TMJ. And ... specifically said I’m [ (Dr. Vitter) ] not a general dentist. I can’t tell you what those standards are. Well, folks, that is the issue in this case. All of the testimony is that Dr. Hawkins is a dentist, and that is the standard that he is held to. He’s not held to the standard of a prosthodontist [such as Dr. Vitter].
And in looking at the case law, ... Mississippi doctors are bound by a national standard of care.... [A]t this point the plaintiff has not met [her] burden of proof in this case in establishing what the national standard for general dentistry is as it would apply to Dr. Hawkins’s actions ... therefore, we cannot go any further to determine if those actions were above or below any standard of care because we simply don’t know what it is.... [W]e don’t even get to the issues of causation and damages.
I would note alternatively, however, as to the causation issue there is very little testimony from Dr. Vitter that states that any deviation from any standard of care that he testified to directly caused any of the problems. He generally refers to assuming that certain things were done, and he generally refers to the treatment as having caused the problems, not to any deviation [from] the standard of care.... [A] bad result or the treatment not working is simply not enough to establish either a breach or a causation.
(Emphasis added.)
¶ 11. Saucier appealed, raising one issue: whether the trial court erred in granting Dr. Hawkins’s motion for a directed verdict.
STANDARD OF REVIEW
¶ 12. The trial judge’s grant or denial of a motion for a directed verdict is reviewed de novo. McGee v. River Region Med. Ctr., 59 So.3d 575, 578 (¶ 8) (Miss.2011). “A motion for directed verdict tests the legal sufficiency of the plaintiffs evidence.” Id. “[The appellate court] considers ‘whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” Id. When deciding whether the grant or denial of the motion for a directed verdict was proper, all evidence must be viewed in the “light most favorable to the nonmoving party,” with “all reasonable inferences” viewed in that party’s favor. *1282 Braswell v. Stinnett, 99 So.3d 175, 178 (¶ 10) (Miss.2012).
ANALYSIS OF THE ISSUE
¶ 13. The trial court ruled that Saucier failed to establish, through the expert testimony of Dr. Vitter, a nationally recognized standard of care for the treatment of Saucier by Dr. Hawkins. On appeal, however, Saucier argues that at trial Dr. Vitter did articulate a nationally recognized standard of care for treatment of patients with symptoms like hers. She maintains Dr. Vitter’s testimony covered the standards of care and the breach of those standards in general dentistry, prosthodontics, and periodontics.
¶ 14. “To establish dental[8] malpractice, a plaintiff must — as a matter of law — produce expert testimony to establish a prima facie case. The expert must establish the ‘requisite standard of care’ and that the defendant ‘failed to conform to that standard.’ ” Id. at (¶ 11) (citations omitted). “Liability turns on a failure to provide the required level of care.” Hall v. Hilbun, 466 So.2d 856, 869 (Miss.1985) (overruled on other grounds). Therefore, “[t]he success of a plaintiff in establishing a case of medical malpractice rests heavily on the shoulders of the plaintiffs selected medical expert.” McGee, 59 So.3d at 578 (¶ 9) (quoting Estate of Northrop v. Hutto, 9 So.3d 381, 384 (¶ 10) (Miss.2009)). “Not only must an expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries.” Id. (quoting McDonald v. Mem’l Hosp., 8 So.3d 175, 180 (¶ 12) (Miss.2009)).
¶ 15. Additionally, “Mississippi physicians are bound by nationally recognized standards of care; they have a duty to employ ‘reasonable and ordinary care’ in their treatment of patients.” Palmer v. Biloxi Reg’l Med. Ctr., Inc., 564 So.2d 1346, 1354 (Miss.1990). The standard of care articulated must be objective, not subjective. Northrop, 9 So.3d at 384 (¶ 9).
¶ 16. During his direct examination, Dr. Vitter testified that when Saucier first came to visit him, her complaints “without question” were symptomatic of TMJ. When asked to define TMJ, Dr. Vit-ter stated: “TMJ is a group of symptoms that seem to be related to a problem with the jaw, and it can be a number of causa-tions. It’s not a specific diagnosis. It’s really a group of causations.... ” Dr. Vit-ter elaborated about the procedures a dentist should use when a patient like Saucier is diagnosed with TMJ:
A. After adequate diagnosis there are essentially four or five treatments. Initial treatment is non-evasive or non-invasive or reversible and then depending on how the patient responds to that you get into more aggressive, more invasive, less irreversible treatment such as joint surgery or reconstructive bites or orthognathic surgery, whatever is appropriate to resolve the patient’s problem.
Q. In your opinion what was the proper procedure that should have been followed for Ms. Saucier’s ease?
A. A patient that is symptomatic? ... TMJ symptoms, you resolve the symptoms prior to doing elective treatment.
Q. How would you resolve those symptoms?
A. You can use a number of things; physical therapy, pharmacological *1283 management, splint therapy, a mouth piece.
Q. Would these be more conservative procedures?
A. More conservative than surgery or orthodontics or restoring the bite through prosthetics, yes. Those are irreversible, and the standard as you asked based on the number of facilities, universities is that you don’t do irreversible procedures until you’ve obtained a stable level of comfort or a stable level of symptoms that the patient can tolerate either via splint or physical therapy, all of those things, and once you’ve stabilized the patient and then determined that what they need to stay that way is to have orthodontics or joint surgery or bite rehabilitation or an acculturation or selective wearing of a splint, but prior to doing irreversible procedures you render the patient asymptomatic first.... It’s diagnostic to determine that the bite is causing the problem as opposed to a habit of clinching or the disarrangement in the joint versus the bite. The initial treatment is also diagnostic as well as therapeutic.
(Emphasis added.) Saucier claims this testimony, paired with the following testimony by Dr. Vitter on the alleged breach of the standard of care for Saucier’s TMJ, articulates the specific, requisite standard of care necessary for Saucier’s claims:
Q. In your review of Dr. Hawkins’s medical records and also your own treatment, did Dr. Hawkins treat Ms. Saucier’s TMJ?
A. No.
Q. What did Dr. Hawkins do?
A. Just reviewing the records, he restored all of the upper teeth with crowns and some lower back teeth with crowns and bridges.
Q. Is this proper procedure for TMJ?
A. Not on a symptomatic patient, no.
Q. In your opinion ... if Dr. Hawkins performed irreversible definitive restorations prior to diagnostic or therapeutic procedures, did he breach the standard of care?
A. In my opinion, yes. It’s the opinion of a number of TMJ organizations, although there’s obviously some controversy across the country and the world about the specifics of that, but most of the universities in this country and a number of facilities believe that you must or at least attempt to render the patient asymptomatic to determine a comfortable [jaw] position before you would restore that occlusion. Restoring a patient while they’re symptomatic is like chasing your tail because inflammable process in the joints, muscle, hyperactive, the bit is changing and you simply cannot provide an accurate bite position on a patient who’s symptomatic. You’re rolling the dice.
(Emphasis added.)
¶ 17. We cannot agree with Saucier that the above testimony definitively establishes a nationally recognized standard of care for the treatment of patients like Saucier. As the trial judge pointed out during her ruling from the bench, Dr. Vit-ter specifically stated twice there is no national standard of care for TMJ, the disorder Saucier is claiming Dr. Hawkins mistreated by performing irreversible dental restorations when she was symptomatic with TMJ. Dr. Vitter also stated that TMJ is managed in different ways, and there is no uniform national standard of care. He also stated there is a standard of care taught at universities, but he never stated what that standard is.
*1284 ¶ 18. Additionally, we note that while Dr. Hawkins is a general dentist, Dr. Vitter was accepted as an expert in the field of prosthodontics, as opposed to general dentistry. Generally, it is “not required that an expert testifying in a medical malpractice case be of the same specialty as the doctor about whom the expert is testifying.” Hubbard v. Wansley, 954 So.2d 951, 957 (¶ 13) (Miss.2007). However, ‘Satisfactory familiarity with the specialty of the defendant doctor is ... required in order for an expert to testify as to the standard of care owed to the plaintiff patient.” Id. (citing West v. Sanders Clinic for Women, P.A., 661 So.2d 714, 718-19 (Miss.1995)). While arguably some prosthodontists could testify about the standard of care applicable to general dentistry, Dr. Vitter specifically stated that he could not testify as to the standard of care for TMJ for general dentists because he was not a general dentist.
¶ 19. Finally, in her reply brief, Saucier also changes the emphasis of her argument from her initial brief to include not just the TMJ symptoms, but the other indications of malpractice initially alleged in her complaint. Accordingly, she argues that Dr. Vitter was offering his opinion on the standard of care in other areas than TMJ, and Dr. Vitter’s testimony thus provided sufficient evidence for a jury to decide the verdict. Again, we disagree.
¶ 20. Saucier’s theory of her case appeared to be that Dr. Hawkins’s performing irreversible restorations, such as placing crowns, before treatment of Saucier’s TMJ (Saucier’s first claim in her complaint), is what caused periodontal disease, bone loss, abscesses, and the numerous dental problems Saucier experienced after Dr. Hawkins’s and Dr. Tillery’s treatment (Saucier’s second, third, and fourth claims in her complaint). Thus, the witnesses in Saucier’s case-in-chief focused on the TMJ and how Dr. Hawkins should have treated it. Therefore, it was absolutely necessary for Dr. Vitter to articulate the standard of care for .treating TMJ, which he failed to do. We find this argument without merit.
CONCLUSION ■
¶ 21. The trial court did not err in granting a directed verdict to Dr. Hawkins. Saucier failed to sustain her burden of establishing, through the expert testimony of Dr. Vitter, a nationally recognized standard of care for the treatment of patients similar in condition to her. Accordingly, we affirm the trial court’s judgment.
¶ 22. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.

. Saucier also sued Dr. Douglas Tillery, but they reached a settlement once discovery ended.

. According to the American Dental Association, “prosthodontics is the dental specialty pertaining to the diagnosis, treatment planning, rehabilitation and maintenance of the oral function, comfort, appearance and health of patients with clinical conditions associated with missing or deficient teeth and/or oral and maxillofacial tissues using biocompatible substitutes. (Adopted April 2003).” American Dental Association, http://www.ada.org/ 2555.aspx# top (last visited Apr. 16, 2013).

.' "TMJ” stands for temporomandibular joint disorder.

. "TMD” stands for temporomandibular disorder and is used interchangeably with "TMJ.”

. These claims were the itemized deviations of care in Dr. Vitter’s letter to Saucier's attorney in June 2005.

. Dr. Vitter testified that he was still treating Saucier.

. Shortly thereafter, Saucier’s counsel moved to have Dr. Vitter admitted as an expert in TMJ dysfunction, dental oncology, and maxil-lofacial prosthetics, in addition to prostho-dontics. However, the trial court sustained defense counsel’s objection to the motion.

. A dentist is liable for the same “failure to exercise requisite skill and care” as a physician. Newport v. Hyde, 244 Miss. 870, 876, 147 So.2d 113, 115 (1962).