BARNES, J.,
for the Court:
¶ 1. Donna Cates filed suit against Dr. William Woods in the Lauderdale County Circuit Court for dental malpractice. The suit stemmed from an incident where a tray containing a compound used to make dental impressions became stuck in Cates’s mouth. The tray required significant effort to remove and allegedly caused injury to Cates’s neck. Dr. Woods moved for summary judgment, claiming Cates failed to designate an expert witness to establish the standard of care, breach, and causation. The trial court granted the summary judgment, and Cates now appeals. Finding no error, we affirm.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶2. On May 16, 2008, Cates went to Family and Preventive Dentistry in Meridian, Mississippi, to have her teeth cleaned. Dr. Woods decided he also wanted an impression made of Cates’s lower teeth. Tamela Brasher, a dental technician employed by Dr. Woods, cleaned Cates’s teeth and then proceeded to make the impression using a tray filled with a dental compound that was inserted into Cates’s mouth. The technician told Cates that Dr. Woods had made a special plate for the impression due to Cates’s small mouth.
¶ 3. When Brasher attempted to remove the impression, the compound would not release from Cates’s teeth. Cates claimed the technician “kept pulling up” 'on the plate while “jerking” her head. Brasher then took an air hose to get between Cates’s gum and the compound in order to release the suction. Cates stated that after Brasher pulled on it, “finally the little plate popped up,” but “when it did, [her] head jerked back.” At one point, Cates stated one side of the tray came off quite forcefully and wedged her mouth open; thus, Cates could not communicate she was in pain. Another technician came to assist Brasher.
¶ 4. Cates’s complaint alleged the technicians “pulled extremely hard to the point that Ms. Cates suffered extensive injury to her neck.” Describing the incident, Cates testified: “They both had their hands on me.... [T]hat’s when the pain started right in the middle of my shoulder blades. It came up over my head and it was just like this lightning bolt burning.... It hurt so bad.... I could see my feet up in the air and that was it. I blacked out.” [1] Dr. Woods had previously made impressions of Cates’s teeth without incident.
¶ 5. Upon returning to work that day, Cates’s neck pain increased; so, the next morning she went to the emergency room, where she received pain medication. After experiencing “full-body numbness” and muscle spasms down her spine, Cates’s family physician recommended an MRI, which came back abnormal. Cates was referred to Dr. David Malloy, a neurosurgeon, who examined her six days after the incident. Dr. Malloy’s clinical notes stated the MRI showed' a lesion on Cates’s spinal cord at “C7-T1,” which was likely a “sub-arachnoid hemorrhage”; Cates’s “[s]udden onset of symptoms and the associated neck *905 stiffness with muscle spasm suggest the possibility of an acute spinal hemorrhage about six days ago.” Three days after seeing Dr. Malloy, Cates was admitted to a local hospital in Merdian for “excruciating pain.” Upon discharge a couple of days later, she was diagnosed with a herniated disk, a mass in her neck, pain, hormone dysfunction, and anxiety. Cates was then referred to another specialist at the University of Mississippi Medical Center.
¶ 6. On May 14, 2010, Cates sued Dr. Woods, doing business as Family and Preventive Dentistry, for dental malpractice. She claimed certain dental technicians employed by him breached the “standard of care required of minimally competent dental technicians.” Discovery ensued, and in his interrogatories, Dr. Woods requested the identity of Cates’s expert witnesses, their proposed testimony, opinions, and supporting documents. Cates responded that no decision had been made regarding experts, and the information would “be supplemented at a later date.” In January 2012, the trial court entered a scheduling order, and Cates’s deadline to provide expert designations was February 15, 2012. Cates never designated any experts.
¶ 7. In March 2012, Dr. Woods moved for summary judgment, arguing Cates had failed to designate an expert to testify regarding the applicable standard of care, breach, or causation, and this failure was fatal to her dental-malpractice claim. Cates’s reply stated that no expert testimony was required, and liability could be established by laypeople. At the hearing on the motion, Cates’s counsel stated he did not designate any experts because here they were not required. During trial, he planned to call Cates’s physician, Dr. Mal-loy, and he would reference medical records indicating that the physician treated Cates for an injury sustained during her dental visit.
¶ 8. The trial court granted summary judgment based on Cates’s failure to designate an expert to articulate the standard of care, failure to show a possible deviation from the standard, and failure to produce any opinions on whether her injuries were proximately caused by an alleged breach. Additionally, the court found the matter was not within the common knowledge of a layman. Cates filed a timely notice of appeal.
STANDARD OF REVIEW
¶ 9. The appellate court reviews the trial court’s grant of summary judgment de novo. Kilhullen v. Kan. City S. Ry., 8 So.3d 168, 174 (¶ 14) (Miss.2009). The evidence will be “viewed in the light most favorable to the party against whom the motion has been made.” Id. at 174-75 (¶ 14) (quoting Daniels v. GNB Inc., 629 So.2d 595, 599 (Miss.1993)). Summary judgment is proper “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” M.R.C.P. 56©. The mov-ant bears the burden of proving that no genuine issue of material fact exists. Buckel v. Chaney, 47 So.3d 148, 153 (¶ 10) (Miss.2010).
DISCUSSION
¶ 10. On appeal, Cates raises two issues. First, she argues that the trial court erred as a matter of law in failing to accept the following: the testimony of Dr. Woods and his dental assistant, Brasher, as to the standard of care; Cates’s own testimony about the breach of that standard; and Cates’s medical records confirming injuries resulting from the breach. Alternatively, she claims the trial court erred in not recognizing the layman’s exception to *906 the necessity of expert testimony in medical-malpractice cases. While there may be a question of fact regarding articulation of an applicable standard of care and whether it was breached, Cates did not sufficiently carry her burden of showing causation to survive summary judgment. Further, we agree with the trial court that the layman’s exception does not apply here.[2]
¶ 11. The plaintiff establishes a prima facie case for medical malpractice by showing:
(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant’s breach of duty was a proximate cause of the plaintiffs injury, and; (4) the plaintiff was injured as a result.'
McGee v. River Region Med. Ctr., 59 So.3d 575, 578 (¶ 9) (Miss.2011) (quoting Delta Reg’l Med. Ctr. v. Venton, 964 So.2d 500, 504 (¶ 8) (Miss.2007)). “The ‘general rule is that medical negligence may be established only by expert medical testimony, with an exception for instances where a layman can observe and understand the negligence as a matter of common sense and practical experience.’” Id. (quoting Coleman v. Rice, 706 So.2d 696, 698 (Miss.1997)). “Liability turns on a failure to provide the required level of care.” Hall v. Hilbun, 466 So.2d 856, 869 (Miss.1985) (overruled on other grounds). Thus, “[t]he success of a plaintiff in establishing a case of medical malpractice rests heavily on the shoulders of the plaintiffs selected medical expert. The expert must articulate an objective standard of care.” McGee, 59 So.3d at 578 (¶ 9) (quoting Estate of Northrop v. Hutto, 9 So.3d 381, 384 (¶ 10) (Miss.2009)). “Not only must an expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries.” Id. (quoting McDonald v. Mem’l Hosp., 8 So.3d 175, 180 (¶ 12) (Miss.2009)).
I. Expert-Witness Testimony
¶ 12. Cates claims that Dr. Woods’s and Brasher’s deposition testimony[3] is suffi *907 cient to establish a jury issue on dental malpractice, and there is thus no need for expert witness testimony. She states Dr. Woods “conceded and admitted” that the standard of care would never permit such force, as described by Cates, to be used while making a dental 'impression. Further, she claims her own testimony and medical records establish breach, causation, and injury. ■ ■
¶ 13. Mississippi has recognized that a medical-malpractice plaintiff “may utilize the defendant himself as a source of proof of the standard of care.” Dickey v. Baptist Mem’l Hosp.-N. Miss., 146 F.3d 262, 265 (5th Cir.1998) (quoting Meena v. Wilburn, 603 So.2d 866, 870 n. 9 (Miss.1992)). “A plaintiff may use the defendant’s own testimony when ‘the physician [as defendant testifies] to the standard in such a clear way that the plaintiff has little trouble demonstrating a deviation from that standard.’” Id. (citation omitted). “Before a qualified expert’s opinion may be received, it must rise above mere specular tion.” Williams v. State, 35 So.3d 480, 486 (¶ 19) (Miss.2010) (quoting Goforth v. City of Ridgeland, 603 So.2d 323, 329 (Miss.1992)). “[O]nly opinions formed by medical experts upon the basis of credible evidence in the case and which can be stated with reasonable medical certainty have probative value.” Id. (quoting Catchings v. State, 684 So.2d 591, 596 (Miss.1996)). “Although an expert need not use the exact phrase, ‘reasonable degree of medical certainty,’ this does not diminish the requirements for admissibility.” Id.
¶ 14. Cates points to the following testimony as “unequivocally” establishing the standard of care. After Dr. Woods stated he removed dental-impression trays and also ones that became “stuck,” Cates’s counsel inquired about the proper way to remove a “stuck” tray:
Every patient is different. Every tray is made differently, so there’s ... not any one protocol that answers all situations. It’s pretty much as my assistant described. If you can’t dislodge it with your wrist, you use air to try to break— get an airway under [the tray]. And if there’s ... a physical undercut, then you have to get-it out a little bit more forcefully-[T]here’s just no one real protocol. [My assistants] do it the same way that I was taught to do it, because I taught them.
Cates’s counsel then asked: “When you’re doing that, Dr. Woods, is there every any situation where you forcefully lift it up — if you are doing it right, is there ever any situation where you [are] forcefully lifting it up to the point where she would be lifted up off that chair?” Dr. Woods responded: “I cannot conceive of any ... impression being removed with that kind of force.... [Y]ou don’t need that kind of force. No, there’s no situation that would use that kind of force.... And ... I don’t think there’s anybody that could physically lift somebody out of a chair.” Additionally, when Cates’s counsel asked Dr. Woods “if it came to the point where you had to physically use that type force to remove it, then you would come in there and cut it out?” Dr. Woods responded: “You just have to get a bur and cut the plastic away from one side and the other side and remove it as just a rubber material.... I wouldn’t say it’s easy.”
¶ 15. While Cates does not point to any specific testimony regarding Brasher as she does with Dr. Woods, the following colloquy, in Brasher’s deposition, between Cates’s counsel and Brasher discussed an alleged standard of care when a dental-impression tray becomes stuck:
Q. So when you put that air in there, it should dislodge the vacuum and it *908 should remove itself very easily; is that right?
A. If you can get the air underneath it, yes,
Q. Okay. Do you ever use enough force to where you just — as hard as you can pull, trying to — pull the tray off?
A. No.
Q. That doesn’t occur—
A. No.
Q. —ever?
A. No.
Q. And it should never occur; right?
A. Correct.
Q. If you have a problem removing it, what’s the proper protocol to use to get it removed, if you have a problem with it sticking?
A. You try to get the air underneath it to release the vacuum and you work with it until you get it out. And if you can’t get it out, then you have to cut the tray out.
Q. How do you do that?
A. He does it with a hand piece.
¶ 16. While we do not find an “unequivocal” standard of care articulated, a general standard of care may have been admitted by Dr. Woods — that one would not remove a dental impression with such force as to lift a patient from a dental chair. His description of the “protocol” in removing the trays could be equated with a standard of care as well. Brasher also articulated that one would never pull as hard as she could to remove the tray.
¶ 17. Dr. Woods argues, however, that neither he nor Brasher possessed the requisite knowledge and expertise to testify regarding the standard of care for dental technicians. Cates counters that if Dr. Woods could not be considered an expert on how to remove dental-impression trays, he should not have been instructing his technicians on how to perform this procedure, which he did. Dr. Woods argues additionally that because Cates did not formally qualify and tender him as an expert, his testimony cannot meet the burden of articulating the standard of care. We reject these contentions. Expert-witness qualification occurs at trial — not at this point in the proceedings — and once an expert witness is proffered, the trial judge will determine if the witness is “qualified as an expert by knowledge, skill, expertise, training or education” and will be afforded wide discretion in doing so. Palmer v. Biloxi Reg’l Med. Ctr., 564 So.2d 1346, 1357 (Miss.1990) (quoting Hall, 466 So.2d at 873). Dr. Woods would have met these requirements due to his position as a practicing dentist, and supervisor of his dental technicians. It is uncontradicted that he trained his technicians as part of his dental practice. Thus, Cates may have submitted sufficient proof to establish duty and breach through a comparison of the testimony of Dr. Woods and Brasher as to duty with Cates’s own testimony as to what occurred during her dental visit, and Dr. Woods’s admission that “there’s no situation that would use that kind of force.”
¶ 18. However, Cates fails to establish a question of fact that any breach of duty was the proximate cause of her injuries. Cates merely argues that the evidence she presented is sufficient for causation — the only “reasonable inference” that could be drawn from her testimony and the submitted medical records[4] is that *909 the breach caused her injury. We disagree. In this case, as in most medical-malpractice cases, expert medical testimony was necessary to link the alleged injuries to the claimed breach.
¶ 19. Cates’s alleged injuries included bodily numbness, muscle spasms, a spinal lesion, a subarachnoid hemorrhage, a heriated disk, and a mass on her neck. While the medical records show these conditions, they do not link them to the dental-impression incident. The only possible linkage to the incident is one of Dr. Mal-loy’s notes, which stated the sudden onset of symptoms could “suggest the possibility” of an acute spinal hemorrhage six days prior to when he saw her, or the date of the dental-tray incident. Speculating that the injury was caused by the incident is not equivalent to the requirement that the medical expert’s opinion is based on “a reasonable degree of medical certainty.” Williams, 35 So.3d at 486 (¶ 19). Here, there was not even a “possibility” but a suggestion of a possibility. Further, Dr. Malloy’s statement did not refer to the specific incident with the dental trays, but only to the date on which the incident occurred, six days prior.
¶ 20. In sum, Cates offered no evidence that could establish a causal connection between her alleged spinal injuries and the alleged deviation from the standard of care for removing dental-impression trays. In medical-malpractice cases, “in the absence of a recognized exception, ‘expert testimony is generally required to survive summary judgment.’ ” Smith ex rel. Smith v. Gilmore Mem’l Hosp. Inc., 952 So.2d 177, 180 (¶ 10) (Miss.2007) (quoting Sheffield v. Goodwin, 740 So.2d 854, 856 (¶ 6) (Miss.1999)). Here, medical records are an insufficient substitute for an expert opinion on causation. Thus, Cates did not carry her burden of showing that any alleged deviation from the standard of care caused her injuries. Accordingly, summary judgment for Dr. Woods was proper.
II. Layman’s Exception
¶21. Cates further contends this case falls under the layman’s exception to the requirement that expert testimony must be used to prove the elements of medical malpractice, because, as she bluntly states, “any idiot” would know that a dental technician should not “jerk” a patient’s “head with such force as to harm the patient’s spine.”
¶ 22. “Medical malpractice cases generally require expert witnesses to assist the trier of fact” in understanding the evidence. Smith, 952 So.2d at 181 (¶ 12) (quoting Palmer, 564 So.2d at 1357). However, as previously stated, a medical expert is not necessary in “ ‘instances where a layman can observe and understand the negligence as a matter of common sense and practical experience.’ ” McGee, 59 So.3d at 578 (¶ 9) (quoting Coleman, 706 So.2d at 698). “Lay testimony is sufficient to establish only those things that are purely factual in nature or thought to be in the common knowledge of laymen.” Hubbard v. Wansley, 954 So.2d 951, 961 (¶ 29) (Miss.2007) (quoting Drummond v. Buckley, 627 So.2d 264, 268 (Miss. *910 1993)). Examples where the layman’s exception has been applied are cases involving foreign objects left inside patients or where patients were given the wrong medication. Vaughn v. Miss. Baptist Med. Ctr., 20 So.3d 645, 653 (¶ 26) (Miss.2009) (citing Smith, 952 So.2d at 181 (¶ 11)). The layman’s exception does not apply to “situations involving judgment calls made by professionals.” Smith, 952 So.2d at 181 (¶ 11).
¶ 23. As Dr. Woods points out, Cates’s “any idiot” argument presupposes proximate causation despite the lack of expert testimony on it. Therefore, even if the layman’s exception applied to prove the standard of care, Cates still failed to designate an expert to provide the link between the perceived breach and her injuries.
¶ 24. Cates’s counsel claims that “everybody knows you don’t pull [out a dental impression] with enough force to lift somebody up off of a chair.” However, a lay witness' — specifically Cates’s own testimony — cannot render an opinion as to whether Cates’s injuries were caused by the dental tray incident. Here, establishing Cates’s numerous and complex injuries were caused by the improper removal of the dental tray would necessitate an opinion of a medical professional’s judgment. The layman’s exception is not sufficient for Cates to withstand summary judgment.
CONCLUSION
¶ 25. Cates’s failure to designate an expert witness is fatal to her dental-malpractice claim. Since she did not designate an expert to establish the proximate cause of her injuries, there were no material factual disputes for a jury to decide. Accordingly, the trial court did not err in granting summary judgment to Dr. Woods.
¶ 26. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Cates’s appellate brief clarifies that her feet were allegedly lifted off the chair’s foot rest, not over her head.

. In Cates’s reply brief, she makes the statement that this “Court should hold that this case is one of 'ordinary negligence.’ ” Dr. Woods, interpreting the statement to mean Cates was raising an alternative argument that this case should not be considered a dental/medical-malpractice case, requested and was granted supplemental briefing on the matter. Cates responded to Dr. Woods’s supplemental brief that she agreed the case is one of dental malpractice, but she was merely arguing it falls within the layman's exception to expert testimony, and that analytically, the case would be indistinguishable from ordinary negligence cases.
Crosthwait v. Southern Health Corporation of Houston, 94 So.3d 1126 (Miss.Ct.App.2011), is instructive on the matter. There, the plaintiff contended that she did not have to offer expert testimony because her claim, stemming from a serious fall after a shower in her hospital room, was only for "ordinary” negligence, not malpractice. Id. at 1128 (¶ 1). To distinguish between malpractice claims and ordinary negligence, a court should consider: "(1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of professional judgment beyond the realm of common knowledge and experience.” Id. at 1130 (¶ 11) (quoting 65 C.J.S. Negligence § 160 (2010)). This Court affirmed the trial court's grant of summary judgment for the hospital, finding plaintiff's claims involved questions of "professional judgment,” and thus her case was one of medical malpractice. Id. at 1132 (¶¶ 18-19). Here, the case undoubtedly involves “professional judgment” in the specialized task of removing dental impressions, and thus is a dental-malpractice claim.

. We note that the record does not include the entire deposition transcripts, but merely excerpts attached to Cates's reply to Woods’s motion for summary judgment.

. In her reply to Woods's motion for summary judgment, Cates attached three medical documents (totaling five pages): two clinical notes by Dr. Malloy, both dated May 22, 2008, one of which is a letter to her referring family physician, and her discharge summary from the hospital in Meridian, dated May 27, 2008. Additionally, at the end of the hearing on *909 summary judgment, the trial judge requested Cates's counsel to provide him the portion of the medical records that would show a connection between her injury and the technicians’ use of force. However, the records Cates provided were the same as the ones attached to her reply, with the exception of a one-page final report dated May 22, 2008, of an MRI. No further medical records on causation were presented. Also, at the time of the hearing, Dr. Malloy had not been deposed; so there was no sworn statement from him.