# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01894-COA

**EVELYN D. BUTLER, INDIVIDUALLY, AS ADMINISTRATRIX FOR THE ESTATE OF ALICE JEAN BUTLER, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF ALICE JEAN BUTLER**

APPELLANT

v.

**CHADWICK NURSING & REHABILITATION CENTER, CHADWICK NURSING AND REHABILITATION CENTER, LLC, JOHN C. FARMER, M.D., AND FARMER AND ASSOCIATES INTERNAL MEDICINE, INC.**

APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2015 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | WILLIAM W. FULGHAM |
| ATTORNEYS FOR APPELLEES: | W. DAVIS FRYE |
| | MILDRED M. MORRIS |
| | TIMOTHY LEE SENSING |
| | ANDREA LA'VERNE FORD EDNEY |
| | JEAN COOPER BERTAS |
| | JOHN BURLEY HOWELL III |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEES' MOTIONS FOR DIRECTED VERDICTS |
| DISPOSITION: | AFFIRMED - 07/25/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Alice Butler was admitted to Central Mississippi Medical Center (CMMC) on October

28, 2009, with severe hip pain. Alice's doctor at CMMC believed that she needed a hip replacement, but he recommended that she undergo a course of rehabilitation to improve her strength prior to surgery. On November 5, 2009, Alice was transferred to Chadwick Nursing and Rehabilitation Center LLC (Chadwick) for rehabilitation. At the time of her admission, Chadwick's staff documented multiple areas of skin breakdown on Alice's body, including two bed sores (pressure ulcers) on her buttock. While Alice was at Chadwick, these sores deteriorated and became infected. On November 27, 2009, Alice was transferred to the emergency room at CMMC, where she was diagnosed with sepsis and other illnesses. On December 27, 2009, Alice died of acute respiratory failure caused by sepsis.

¶2.    Alice's daughter, Evelyn, subsequently filed a medical malpractice complaint against Chadwick and Alice's primary physician at Chadwick, Dr. John Farmer. Evelyn alleges that Chadwick failed to notify Alice's doctors of changes in her condition in a timely fashion. She also alleges that Dr. Farmer's treatment of Alice did not meet the standard of care. She further alleges that these failures by Chadwick and Dr. Farmer more likely than not caused Alice's death. The case eventually proceeded to a jury trial. However, at the conclusion of Evelyn's case-in-chief, the circuit judge granted the defendants' motions for directed verdicts because the judge concluded (1) that there was insufficient evidence that any alleged breach of care by Chadwick caused Alice's death and (2) that as a matter of law Evelyn failed to establish any breach of care by Dr. Farmer. We agree with the circuit court that both defendants were entitled to judgment as a matter of law. Therefore, we affirm.

2

**FACTS AND PROCEDURAL HISTORY**

¶3.     In October 2009, Alice Butler was sixty-eight years of age. She had been diagnosed with diabetes, hypertension, arthritis, and gout. She was morbidly obese, and her medical history also included a diabetic coma, a stroke, and heart bypass surgery. However, Alice lived in her own home and was able to care for herself.

¶4.     Alice also suffered from degenerative joint disease. On October 28, 2009, she went to see her doctor, Dr. Hursie Davis Sullivan, because she had been unable to walk for three days due to severe pain in her left hip. At Dr. Sullivan's recommendation, Alice was admitted to CMMC the same day for her hip pain.

¶5.     One of the doctors at CMMC, Dr. Temple, felt that Alice needed a hip replacement, but he recommended Alice should go somewhere for a period of rehabilitation prior to surgery. Alice's family placed her at Chadwick for rehabilitation.

¶6.     Alice was transferred from CMMC to Chadwick on November 5, 2009. Alice's family testified that for about the first week she was at Chadwick, she seemed to be normal and in good spirits.

¶7.     Dr. Farmer was Alice's admitting physician at Chadwick. Upon her admission on November 5, Chadwick's staff evaluated Alice and noted two bed sores (i.e., pressure ulcers) on her buttock that were described as "open" and "red in color" but without any "drainage or odor." One sore measured three and a half centimeters by one centimeter, and the other measured two centimeters by one centimeter. On November 10, Chadwick's staff noted that

3

one of Alice's sores was eight centimeters long and four centimeters wide. Records indicate that there was no odor from the sores, but there was some drainage.

¶8.     On November 13, Chadwick's staff noted in Alice's records that she had not walked in the previous seven days and needed "extensive assistance" to bathe or use the restroom. Alice got around Chadwick primarily by using a wheelchair. Alice's records also reflect that she experienced hip and joint pain daily that at times was "horrible or excruciating."

¶9.     Alice's family testified that they noticed a change in her condition during her second week at Chadwick. They testified that Alice was almost always asleep when they went to visit her, but Chadwick's staff told them that Alice was just tired from her rehabilitation.

¶10.    On November 17, Alice's sores developed slough. Chadwick's staff notified Dr. Farmer of this change in Alice's condition, and he ordered that the wound be treated with Santyl, a chemical debriding agent, to remove the slough. Alice's records reflect that on November 18 the wound was still eight centimeters long by eight centimeters without odor or drainage; however, the wound had turned yellow in color and slough was present.

¶11.    Alice's family testified that Alice continued to sleep a lot during her third week at Chadwick, and Evelyn testified that she stopped receiving daily phone calls from Alice. Alice's family testified that they were concerned about Alice and continued to question staff about her condition.

¶12.    At some point during Alice's third week at Chadwick, Evelyn learned about Alice's wound for the first time. Evelyn testified that she asked to see the wound on more than one

4

occasion, but Chadwick's staff told her that she could not because the wound had just been treated with ointment or bandaged or because Alice was asleep. Evelyn testified that she also briefly spoke with Dr. Farmer but that he was too "busy" to talk for long.

¶13. According to nursing notes, Dr. Farmer saw Alice on November 23. Notes from November 24 indicate that the wound had not grown and was still yellow in color without drainage or odor. Shortly before midnight on November 26, Alice's wound began draining and an odor was noted. On November 27, the wound opened and was revealed to be an abscess. Chadwick notified the on-call physician, Dr. Obie McNair, of the changes in Alice's condition. Dr. McNair ordered Chadwick to continue to monitor Alice's condition and to send her to the hospital if she had a fever or if her level of consciousness changed. Dr. McNair also ordered that the wound be cleaned with Betadine and nystatin powder, which are topical antibiotics.

¶14. On November 27, Alice was transferred back to CMMC. She was admitted with diagnoses of an altered mental state (a possible symptom of an infection), severe anemia, and acute renal failure, along with dehydration, diabetes, and hypertension. She immediately was started on antibiotics for her infected wounds and possible sepsis. Surgical debridement was also performed on the wound at CMMC.

¶15. Alice passed away on December 27. Her death certificate listed the causes of death as acute respiratory failure, septicemia, pneumonia, hypertension, and diabetes.

¶16. In August 2011, Evelyn, as the administrator of Alice's estate and on behalf of Alice's

wrongful death heirs, filed a medical malpractice complaint against Chadwick and Dr. Farmer in the Hinds County Circuit Court. The case eventually proceeded to a jury trial on November 8, 2015.

¶17. At trial, Linda Sellers testified for the plaintiff as an expert in the field of nursing. Sellers was employed as a "surveyor" for the "Joint Commission," an independent accreditation organization for nursing homes and other healthcare facilities. Sellers previously worked as a registered nurse and as a director of nursing and administrator at a nursing home/assisted living facility. On direct examination, Sellers testified, in general terms, that the staff at Chadwick breached the standard of care by failing to notify a physician promptly of changes in the condition of Alice's wound and of changes in her fluid intake.

¶18. On cross-examination, Sellers testified that the "standard of care" that she applied in this case consisted of federal guidelines promulgated by the Center for Medicare and Medicaid Services (CMS). Sellers expressly equated a "breach of the standard of care" to "a violation of a federal guideline." However, Sellers admitted that a reasonable and competent nursing home may not always comply with federal guidelines.

¶19. Sellers also testified that Chadwick appropriately evaluated and addressed Alice's sores upon her admission to the facility on November 5. Sellers acknowledged that nurses notified Dr. Farmer of the sores, and that Dr. Farmer prescribed a "reasonable" and "typical" course of treatment, which the facility carried out according to his orders.

¶20. Sellers also acknowledged that on November 17, when the wound developed slough,

6

Chadwick responded appropriately by notifying Dr. Farmer. She agreed that Dr. Farmer prescribed a debriding agent and that Chadwick again carried out his orders regarding treatment. Sellers also agreed that the National Pressure Ulcer Advisory Panel (NPUAP) is "the expert group on pressure ulcers in the United States" and that they "recommend[] against the use of topical antibiotics on a wound like [Alice's]."

¶21. Sellers further testified that she was not critical of Chadwick for not transferring Alice to CMMC prior to November 27. In fact, Sellers agreed that "Chadwick responded appropriately to [Alice's] changes in condition" during her "final five days in the nursing home." Sellers also agreed that on November 27, when the wound opened and revealed an abscess, Chadwick responded appropriately by notifying Dr. McNair, the on-call physician.

¶22. Dr. Christopher Davey testified for the plaintiff as an expert in the fields of geriatric medicine, internal medicine, and wound care. Dr. Davey testified that the wound near Alice's sacrum was 6.3 centimeters deep when she was admitted to CMMC on November 27. As a result, the infection reached the bone (the sacrum). Dr. Davey testified that the infection of the bone was "a really serious matter" because such an infection is "incurable in almost all cases." Dr. Davey testified that this infection led to Alice's death because the infection was caught "too late" to be treated effectively. Alice's immediate cause of death was respiratory failure, but sepsis caused her respiratory failure. Dr. Davey also testified that Alice was severely dehydrated when she was admitted to CMMC; however, CMMC was "able to correct" the dehydration by administering fluids.

7

¶23. Dr. Davey testified that "debridement"—the removal of dead and infected tissue from a wound to promote healing—may be done either surgically or with medicines. Santyl is the only medicine approved by the FDA for this purpose. Dr. Davey testified that generally a wound is infected once it develops slough. Dr. Davey was critical of Dr. Farmer for treating Alice's wound with Santyl (a debriding agent) alone after the wound developed slough on November 17. Dr. Davey maintained that, at that point, the standard of care required Dr. Farmer to also treat the wound with a topical antibiotic ointment. Dr. Davey also testified that it was "more likely than not" that Alice would have survived if Dr. Farmer had ordered a topical antibiotic on November 17, 18, or 19.

¶24. On cross-examination, Dr. Davey testified that he had no criticisms of Dr. Farmer's orders between Alice's admission to Chadwick on November 5 and November 16. He also testified that Dr. Farmer's November 17 order to apply Santyl (the chemical debriding agent) to the wound was appropriate. Dr. Davey testified that he believed that the wound became infected sometime between November 18 and 21 or possibly as early as November 17. Dr. Davey opined that Dr. Farmer breached the standard of care by not ordering a topical antibiotic ointment after the wound did not respond to treatment with Santyl.

¶25. However, Dr. Davey acknowledged that "reasonable doctors can disagree about the use of topical antibiotics on pressure ulcers." Dr. Davey specifically acknowledged that the guidelines issued by the NPUAP state in relevant part: "Limit the use of topical antibiotics on infected pressure ulcers, except in special situations. . . . In general, topical antibiotics

are not recommended for pressure ulcers." Dr. Davey admitted that the NPUAP guidelines are "authoritative." He also admitted that he had urged NPUAP to amend this very guideline; however, the organization had not done so.

¶26.    On redirect examination, Dr. Davey pointed out that the NPUAP guidelines permit the use of topical antibiotics "in special situations." He was then asked: "What are those special circumstances?" He answered: "If the wound gets infected."

¶27.    At the conclusion of Evelyn's case-in-chief, Chadwick and Dr. Farmer each moved for a directed verdict. Chadwick argued that Sellers failed to articulate the applicable standard of care for a nursing home or how it was breached; rather, Sellers conflated CMS regulations with the relevant standard of care. Chadwick also argued that Evelyn failed to introduce any competent evidence that any alleged breach of the standard of care caused or contributed to Alice's death. Dr. Farmer primarily argued that Evelyn failed to establish a breach of the standard of care because Dr. Davey effectively admitted that Dr. Farmer's treatment was consistent with "authoritative" NPUAP guidelines. The circuit judge granted the defendants' motions and subsequently entered a final judgment dismissing Evelyn's claims with prejudice. Evelyn filed a timely notice of appeal.

## DISCUSSION

¶28.    We review a ruling granting a motion for a directed verdict de novo. *Braswell v. Stinnett*, 99 So. 3d 175, 177-78 (¶10) (Miss. 2012). A directed verdict should be granted if the moving party is entitled to judgment as a matter of law. *Id.* at 178 (¶10). The evidence

9

must be viewed in the light most favorable to the non-moving party, with all reasonable inferences granted in favor of that party. *Id.* However, a "trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree." *Vines v. Windham*, 606 So. 2d 128, 131 (Miss. 1992).

¶29. To establish a prima facie case of medical malpractice, a plaintiff must come forward with proof of

> the existence of a duty on the part of the physician to conform to the specific standard of conduct, the applicable standard of care, the failure to perform to that standard, that the breach of duty by the physician was the proximate cause of the plaintiff's injury, and that damages to plaintiff have resulted.

*Estate of Northrop v. Hutto*, 9 So. 3d 381, 384 (¶9) (Miss. 2009) (quoting *Barner v. Gorman*, 605 So. 2d 805, 808-09 (Miss. 1992)).

¶30. A "physician's non-delegable duty of care is this":

> [G]iven the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.

*Hall v. Hilburn*, 466 So. 2d 856, 873 (Miss. 1985) (superceded by statute on other grounds).

¶31. "The success of a plaintiff in establishing a case of medical malpractice rests heavily on the shoulders of the plaintiff's selected medical expert." *Estate of Northrup*, 9 So. 3d at 384 (¶10). Expert testimony in a medical negligence case must establish an "objective" and "nationally recognized" standard of care and a breach thereof. *Id.* at (¶9); *McIlwain v.*

10

*Natchez Cmty. Hosp. Inc.*, 178 So. 3d 678, 686 (¶¶26-27) (Miss. 2015).  The expert's own personal preferences or practices—i.e., simply what the expert says that he or she would have done in the same scenario—are insufficient to establish an objective, national standard of care.  *See Estate of Northrup*, 9 So. 3d at 384-87 (¶¶9-13).  In general, expert testimony also is necessary to establish medical causation.  *See, e.g.*, *Henson v. Grenada Lake Med. Ctr.*, 203 So. 3d 41, 44 (¶10) (Miss. Ct. App. 2016).

¶32.   The same basic rules apply to claims of medical negligence against healthcare facilities for alleged breaches of the nursing standard of care.  *See, e.g.*, *id.* at 44-46 (¶¶8, 14-15); *Williams v. Manhattan Nursing & Rehab. Ctr. LLC*, 148 So. 3d 20, 22-23 (¶10) (Miss. Ct. App. 2014).  A nurse is competent to testify as to the applicable nursing standard of care but not as to issues of medical causation.  *See Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 652 (¶¶20-21) (Miss. 2009).

¶33.   Evelyn's brief on appeal fails to address the specific issues that the defendants raised when they moved for directed verdicts at trial.[1]  Evelyn asserts that the trial judge "usurped the jury's domain, determined what weight and credibility to give the experts' testimony, resolved factual issues," and generally engaged in "out-of-bounds conduct."  However, this simply is not the case.  As we explain below, Evelyn's proof was objectively lacking on at least one essential element of her claim as to each defendant.  Accordingly, there was nothing

---

[1] The defendants raised these same issues again in their briefs on appeal; however, Evelyn did not file a reply brief.

11

to submit to the jury for determination, and the trial judge property granted the defendants' motions for directed verdicts.

## I.  Dr. Farmer

¶34.    Dr. Davey's criticism of Dr. Farmer—the alleged breach of the standard of care—was that Dr. Farmer did not prescribe a topical antibiotic ointment after Alice's wound became infected, which Dr. Davey estimated as having occurred between November 18 and 21. However, Dr. Davey conceded that "reasonable doctors can disagree about the use of topical antibiotics on pressure ulcers."  Moreover, Dr. Davey specifically admitted that "authoritative" guidelines concerning the treatment of pressure ulcers state: "Limit the use of topical antibiotics on infected pressure ulcers, except in special situations. . . .  In general, topical antibiotics are not recommended for pressure ulcers."  Dr. Davey testified that he, personally, does not agree with this guideline and has urged its amendment.  On redirect, Dr. Davey pointed to the guidelines' statement that topical antibiotics may be used "in special situations," and he claimed that a "special situation" exists "[i]f the wound gets infected." However, this testimony was illogical and inconsistent with the guideline.  The guideline specifically addresses the treatment of "*infected* pressure ulcers" (emphasis added); an infected wound *is the situation* that the guidelines address, not a "special situation."[2]

---

[2] We also note that, although she would not have been competent to testify to the standard of care for a physician, Sellers testified that she had never applied a topical antibiotic to a wound like Alice's and did not believe that such treatment would be consistent with the nursing standard of care.

12

¶35.    Under Mississippi law, Dr. Davey's testimony failed to establish a specific, legally sufficient standard of care or a violation of any standard of care.  In *Estate of Northrup*, *supra*, the Supreme Court held that an expert's testimony about how he believed an IV should have been monitored failed to establish an objective, national standard of care.  *See Estate of Northrup*, 9 So. 3d at 384-87 (¶¶9-13).  The Court held that the expert's "personal preferences [did] not establish a national standard of care."  *Id.* at 387 (¶13).  Similarly, in *Braswell v. Stinnett*, 99 So. 3d 175 (Miss. 2012), the Court held that an expert's testimony about his own view of "*good dental practice*" failed to establish a legally sufficient standard of care—i.e., "what is required of a *minimally competent* dentist."  *Id.* at 179 (¶14) (emphasis in original).  And in *Conn v. United States*, 880 F. Supp. 2d 741 (S.D. Miss. 2012), the federal district court held that an expert's testimony as to what his own "professional recommendation . . . would have been" failed to establish the requisite standard of care under Mississippi law.  *Id.* at 744.  As that court put it, "[t]he Mississippi Supreme Court has held that an expert's personal recommendations do not amount to a standard of care."  *Id.*

¶36.    The result is the same in this case.  Dr. Davey's testimony was shown to be nothing more than his own personal opinion about how Alice should have been treated.  Dr. Davey conceded that reasonable doctors can disagree about how to treat infected pressure ulcers, and he admitted that "authoritative" guidelines caution against the use of topical antibiotics.  No evidence was presented at trial that the course of treatment prescribed by Dr. Farmer was inconsistent with those authoritative guidelines.  Moreover, no evidence was presented that

13

the treatment ordered by Dr. Farmer was "below *objectively ascertained* minimally acceptable levels" practiced by physicians nationwide. *Estate of Northrup*, 9 So. 3d at 384 (¶9) (quoting *Hall*, 466 So. 2d at 873). "Dr. [Davey's] personal preference does not establish a national standard of care." *Id.* at 387 (¶13). Because Evelyn failed to establish the standard of care or a breach thereof, Dr. Farmer was entitled to judgment as a matter of law, and the trial judge properly granted his motion for a directed verdict.

## II. Chadwick

¶37. Having reviewed the entirety of Sellers's testimony, we remain unclear as to how exactly she believed that Chadwick had breached the nursing standard of care. Sellers testified that she had no criticisms of the care provided by Chadwick from the time of Alice's admission on November 5, 2009, through at least November 17. She also testified that she had no criticisms of the care that Chadwick provided during Alice's final five days at the facility (November 22 to November 27). Sellers did *not* contend that Chadwick should have transferred Alice to the hospital prior to November 27. Without providing any specifics, Sellers simply asserted that Chadwick did not provide "prompt" notification to Alice's physicians of changes in her condition, including the "worsening of the pressure ulcer" and Alice's lethargy, reduced intake of food and fluids, and dehydration.

¶38. As to any alleged breach related to dehydration, there is, at a minimum, a causation problem. Sellers was not competent or qualified to testify as to issues of medical causation, *see Vaughn*, 20 So. 3d at 652 (¶¶20-21), and the plaintiff's causation expert, Dr. Davey,

14

testified that issues related to Alice's dehydration were resolved once she was transferred to CMMC. Therefore, there was no evidence that such a breach caused Alice's death.

¶39.    Furthermore, Sellers's assertions that Chadwick failed to notify physicians of changes in the condition of the wound were conclusory and unsupported by facts. Sellers had no criticisms of Alice's care through November 17. There is no dispute that on November 17 Chadwick *did* notify Dr. Farmer of the condition of the wound, which had developed slough. There is also no dispute that Dr. Farmer prescribed a course of treatment, which Chadwick followed. Sellers also admitted that she had no criticisms of Alice's care from November 22 to 27.[3] In her testimony at trial, Sellers failed to identify what changes she thought that Chadwick should have brought to the attention of a doctor between November 17 and 22. There is also no evidence that any such notification would have changed the outcome. Dr. Farmer saw Alice on November 23 but made no changes to her course of treatment—which, as we have already discussed, was not shown to be contrary to any recognized standard of care.

¶40.    As we recently reiterated, a "conclusory expert [opinion] that fails to explain the underlying 'how, when, and why' is insufficient to withstand [a motion for judgment as a matter of law]." *Henson*, 203 So. 3d at 45 (¶15) (quoting *Gray v. Dimitriades*, 211 So. 3d 738, 745 (¶29) (Miss. Ct. App. 2016)). This principle applies to Sellers's testimony. At trial,

---

[3] Sellers admitted that when the wound's condition changed on November 26 and 27, Chadwick responded appropriately by promptly notifying the on-call physician.

Sellers made conclusory assertions that Chadwick failed to meet its duty to promptly notify Alice's doctors of changes in her condition; however, she failed to identify any specific instances in which Chadwick failed to notify Alice's doctors of changes in her condition. In addition, there is no competent evidence in the record to link the unspecified, alleged breaches of care to Alice's death. Accordingly, Chadwick also was entitled to judgment as a matter of law, and the trial judge properly granted its motion for a directed verdict.[4]

## CONCLUSION

¶41. For the foregoing reasons, both Dr. Farmer and Chadwick were entitled to judgment as a matter of law; therefore, the trial judge properly granted their motions for directed verdicts, and we affirm.

¶42. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, GREENLEE AND WESTBROOKS, JJ., CONCUR. FAIR, J., NOT PARTICIPATING.**

---

[4] There is also a question as to whether Sellers articulated a legally sufficient standard of care, as she seemed to equate violations of federal regulations to breaches of the standard of care. *See Moore ex rel. Moore v. Mem'l Hosp. of Gulfport*, 825 So. 2d 658, 665 (¶24) (Miss. 2002) (holding that the State Board of Pharmacy "regulations do not establish a legal duty of care to be applied in a civil action"). As Chadwick was entitled to judgment as a matter of law on other grounds, we need not address this issue.

16