# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00341-COA

**CHASE DEAR**                                                                                    **APPELLANT**

**v.**

**CARES CENTER INC.**                                                                              **APPELLEE**

DATE OF JUDGMENT:              03/04/2020
TRIAL JUDGE:                  HON. PRENTISS GREENE HARRELL
COURT FROM WHICH APPEALED:    LAMAR COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       DANIEL MYERS WAIDE
ATTORNEYS FOR APPELLEE:       JASON SCOTT GILBERT
                              HUGH RUSTON COMLEY

NATURE OF THE CASE:           CIVIL - OTHER
DISPOSITION:                  AFFIRMED - 06/15/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McCARTY AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     Chase Dear filed a complaint against his former employer, Cares Center Inc. (Cares), and asserted that Cares wrongfully terminated his employment after he reported a coworker's criminal conduct. The Lamar County Circuit Court granted Cares a directed verdict under Mississippi Rule of Civil Procedure 50(a) after finding that (1) Dear failed to show the reported conduct was criminal, and (2) the evidence failed to demonstrate that Cares terminated Dear's employment because he reported the alleged criminal conduct. On appeal, Dear asserts the circuit court should have submitted the case to the jury rather than granting Cares's directed verdict motion. Specifically, Dear asserts the following: (1) a reasonable

juror could have found that he reported criminal conduct to Cares; (2) the circuit court erroneously concluded that Cares intended to terminate his employment regardless of his report; and (3) the circuit court erroneously determined the cause of the termination.

¶2. Upon review, we conclude that Dear failed to present sufficient evidence for a reasonable juror to find that a criminal act occurred. Because we affirm the circuit court's judgment on the first ground, we need not address Dear's remaining assignments of error pertaining to the second basis for the circuit court's decision. *See Estate of Turner v. Town Pharmacy & Gifts LLC*, 310 So. 3d 1229, 1236 (¶25) (Miss. Ct. App. 2021).

**FACTS**

¶3. In November 2018, Canopy Children's Solutions (Canopy) hired Dear to work at Cares, its school for children with emotional and behavioral disabilities. Each Cares classroom was assigned one teacher and one behavioral education interventionalist (BEI). The BEI assisted whenever a behavioral issue arose with a student so that the teacher could maintain the role of educator. Although Dear originally applied to work at Cares as a BEI, Canopy offered him a teaching position. The offer letter Dear received from Jynger Morris, Canopy's human-resources director, specified that Dear's employment would be at-will and that he or Canopy could terminate the employment at any time with or without notice and either with or without cause. In addition, because Dear had not yet obtained his special-education teaching license, Canopy hired Dear as a substitute teacher and classified him as a pro re nata (PRN) employee to work on an as-needed basis.

¶4. Despite Dear's designation as a PRN employee, Dr. Anne Russum, the principal at

2

Cares, testified that Dear was hired with the expectation that he would soon obtain his teaching license and become eligible to fill a full-time teaching vacancy. As a result, Canopy placed Dear as a substitute teacher in a classroom with about seven to ten children who had severe behavioral issues. Canopy and Cares hoped that Dear would prove to be a good fit for the classroom and could become the classroom's full-time teacher once he obtained his teaching license.

¶5.     On Monday, December 10, 2018—the ninth day that Dear had worked at Cares—Dear witnessed Arthur McLaughlin, a BEI assigned to his classroom, perform a management-of-assaultive-behavior (MAB) hold on a disruptive student named N.T.[1] Later that same morning, Dear met with Russum and Robin Davis, the individual-education-plan (IEP) coordinator and teacher-supervisor at Cares, to discuss Dear's eligibility for healthcare benefits. At the beginning of the meeting, Dear reported that McLaughlin had performed an improper MAB hold because he had "body slammed" N.T. to the ground. After Dear informed her of the incident, Russum assured him that an investigation would follow. Both Russum and Davis testified that Dear then immediately began questioning them about his eligibility for healthcare benefits.

¶6.     When Dear walked outside to take a smoke break, another employee informed Russum and Davis that Dear possibly had the flu. Upon Dear's return, Russum inquired about his health, and Dear indicated that he did had a fever and might have the flu. Russum sent Dear home for the day and suggested that he see a physician.

---

[1] We use initials to protect the minor child's privacy.

3

¶7.    The next morning, on Tuesday, December 11, 2018, Dear informed Davis that he had pneumonia.  That same morning, Davis texted Dear the following message: "After our conversation yesterday, since you expressed you did not want to work every day, I'll call you when a substitute is needed."  Dear responded that afternoon and stated that he did want to work every day at Cares but also "need[ed] benefits for full-time hours."  Dear stated that he hoped to obtain his special-education teaching license soon and to move into a full-time position at Cares.  After forty-five minutes passed without Davis responding to his message, Dear called the child-abuse hotline for the Mississippi Department of Child Protection Services (CPS) and reported the incident from the previous day.

¶8.    On December 14, 2018, Morris and Russum had a conference call with Dear and informed him of his termination.  The two women assured Dear that his termination was in no way related to the report of abuse, and they explained they simply felt Dear was not a good fit for Cares.  The following week, on December 21, 2018, Dear filed his civil complaint and asserted that Cares had wrongfully terminated his employment because he reported McLaughlin's alleged criminal conduct.  The circuit court held a two-day jury trial in November 2019.  During his case-in-chief, Dear testified on his own behalf and called as adverse witnesses the following Canopy/Cares employees: Morris, Russum, Davis, and Sonya Felts, who not only served as the lead BEI at Cares but also witnessed the hold McLaughlin had performed on N.T.

¶9.    At trial, Davis testified that she served as Dear's direct supervisor while he worked at Cares.  Although Davis did not formally observe Dear during his nine days at Cares, she

4

informally observed him by walking around his classroom multiple times. Davis explained that the teachers at Cares could not simply stand at the front of a classroom and teach a lesson. Instead, because the students were at different academic levels and proficiencies, the teachers had to rotate around the classroom and work individually with students to address the students' needs. Davis testified that each time she observed Dear, he was always seated at his desk and did not appear to be engaged with the students.

¶10. Based on her observations of Dear, Davis opined that Dear was not interested in teaching the students but was more interested in working as a BEI. Davis stated she had explained to Dear when he first began working at Cares that behavioral intervention was the role of the BEI rather than the teacher. Nevertheless, Davis testified that Dear left his classroom on multiple occasions to intervene when a student was being attended to outside the classroom for behavioral matters.

¶11. After Dear's first week at Cares, Davis asked Tina Allman, another teacher with almost twenty years of teaching experience, to help Dear acclimate to Cares. Davis asked Allman to show Dear how to use the classroom computers, to explain the students' IEPs to Dear, and to answer any questions Dear might have. After meeting with Dear, Allman reported to Davis that Dear simply "was not interested."

¶12. Just like Davis, Russum opined that Dear did not really desire to be a teacher at Cares. Instead, Russum stated Dear made it very clear from the beginning that he preferred to handle the students' behavioral issues. Also like Davis, Russum testified that she conducted informal walkthroughs of Dear's classroom to speak to the students and to observe Dear.

Russum stated that during Dear's first several days at Cares, she and Davis simply observed and monitored Dear to see whether he would be a good fit for the school. Russum testified that a formal evaluation with feedback usually did not occur until an employee had been at the school for thirty days. Russum stated that Dear had been asked to get to know the students during his first few days and to review their records on his own time. Russum testified, however, that Dear never reviewed the students' records and that during her walkthroughs, she never observed him speaking to the children or trying to develop a relationship with them.

¶13. Russum and Davis both testified that Dear walked into their meeting on December 10, 2018, and stated he had witnessed an improper hold where McLaughlin had "pushed" or "body slammed" N.T. to the floor. Both administrators testified that Dear never claimed McLaughlin had choked N.T. or had placed his forearm across N.T. and squeezed her throat. Davis testified that the first time she heard such allegations was when she listened to Dear's phone call to the CPS hotline. If Dear had walked into their meeting and made such claims, Russum and Davis both stated that they would have immediately contacted law enforcement because they did not allow that type of conduct to occur at Cares.

¶14. Russum and Davis both described N.T. as a bigger child. Davis stated that N.T. could be "[v]ery violent" and would "[t]hrow things, scratch, bite, hit, pull hair, . . . [and] tear things off the wall . . . ." Davis also stated that N.T. often screamed repeatedly even when no one was touching her. As the BEI in N.T.'s classroom, McLaughlin had an especially good relationship with N.T., and Russum and Davis both testified that N.T. loved and

respected McLaughlin. Russum and Davis described McLaughlin as a gentle giant. Neither administrator had ever seen McLaughlin lose his temper or react out of anger, even though students had hit, kicked, spit on, and screamed at him as he tried to calm them. After Dear reported the incident with McLaughlin and N.T., Russum testified that she went to check on N.T. Once N.T. had calmed down, she and McLaughlin went to the school kitchen and ate a snack together before returning to their classroom. When Russum located them, N.T. "was sitting in the classroom with [McLaughlin], and she was fine," with "[n]o issues whatsoever."

¶15.   Russum testified that she asked Dear whether anyone else had witnessed the hold on N.T., and Dear responded that Felts had also been present. As the lead BEI at Cares, Felts was supposed to be present any time a physical hold occurred at the facility. Russum assured Dear that she would speak to Felts and initiate an investigation. Felts reported to Russum that she had witnessed the incident with N.T. and that McLaughlin had conducted a proper MAB hold. In addition to speaking with Felts, Russum contacted Canopy's human-resources department and reported Dear's allegation. Former police officer Lee Barton, who worked as Canopy's investigation and security manager, investigated the incident. Barton ultimately found Dear's allegations of an improper hold to be unsubstantiated.

¶16.   The same week that Dear reported the abuse allegation to Russum and Davis, Russum called Canopy's human-resources director, Morris, and spoke to her about Dear. Russum, Davis, and Morris all testified at trial that Dear's termination had nothing to do with his report of abuse and that they wanted employees to report their concerns. The three women

7

instead stated that Dear's termination was due to certain "red flags" that had arisen regarding his workplace performance and personality. Russum and Davis both expressed concerns about whether Dear was a good fit for the workplace dynamics at Cares. Their testimony reflected that Cares operated as a team environment and that Dear had been unable to operate within that established framework. Russum stated that one of the biggest core values at Cares was the development of relationships and that she had not seen Dear cultivate relationships with either the other staff members or the students. In addition, Davis testified that rather than teach the students as he had been hired to do, Dear had repeatedly interjected himself into the students' behavioral issues, and the results had not proved helpful.

¶17. Felts also testified at trial and, like Russum and Davis, got the impression from her conversations with Dear that he wanted to be involved in handling the students' behavioral issues. Felts explained at trial that the BEIs always hoped to avoid using holds on the students. Because the children sometimes fought or resisted when they became upset, though, Felts stated the BEIs were trained in the proper way to perform a hold when no other option existed to stop certain behavior and calm down the children. With regard to N.T., Felts stated that N.T. was strong and could be aggressive. Although N.T. often fought and screamed, Felts testified that N.T. would return to her scheduled activity once she calmed down. Felts further stated, however, that it could take multiple people to stop N.T. from tearing something up or harming others.

¶18. Felts testified that on the morning in question, N.T. had been running down the school hallway; knocking pictures off the wall; and kicking, screaming, and cursing at other people.

Although such behavior was not unusual for N.T., Felts testified that N.T.'s disruptive behavior had been going on for over two hours. After staff members got N.T. to enter the timeout room at Cares, Dear blocked N.T. from leaving. Felts testified that N.T. grew even angrier and began to scream, push, kick, and curse at Dear. At that point, Felts stated that she asked McLaughlin to come to the timeout room to help with N.T.'s behavior.

¶19. As McLaughlin and Felts entered the timeout room, Dear backed away from N.T. While Dear stepped into the hallway, Felts stated that she remained inside the timeout room and assisted McLaughlin. Felts testified that she disagreed with Dear's version of what happened next. Contrary to Dear's account of events, Felts testified that she never observed McLaughlin put his arm across N.T.'s throat and that McLaughlin never body slammed or otherwise threw N.T. to the ground. Felts also disagreed with Dear's statement that McLaughlin was angry when he performed the hold on N.T.

¶20. Felts stated that McLaughlin approached N.T. and took hold of her wrist. In response, N.T. screamed and dropped to the ground like dead weight. Although N.T. screamed for quite some time, Felts stated that N.T. never acted out of terror or pain. According to Felts, N.T. often screamed and "dead weighted" when she did not want someone to place her into a hold to stop her behavior. Felts testified that N.T. would drop to the ground to pull the other person down as well. On the occasion in question, Felts stated that McLaughlin indeed tumbled to the ground along with N.T. after N.T. "dead weighted." Felts testified, however, that no one hurt N.T. and that N.T. remained uninjured after the incident.

¶21. Felts attempted to speak to N.T. and calm her down as she assisted McLaughlin with

9

the hold. Once she and McLaughlin had the situation under control, Felts told Dear that he could return to his classroom, which he did. Felts testified that N.T. continued to kick and scream but that she would occasionally stop to curse at other children who walked by the room. After about ten to fifteen minutes, N.T. calmed down and completely stopped her behavior. Felts testified that N.T. and McLaughlin then went to the school kitchen together to get a snack before they returned to their classroom.

¶22. Dear also testified on his own behalf at trial. With regard to the alleged criminal conduct he witnessed on December 10, 2018, Dear testified that McLaughlin grabbed N.T. by her arm and that N.T. began screaming frantically. As N.T. tried to pull away from McLaughlin, Dear stated that her arm twisted, and she ended up falling to the floor. Like Felts, Dear testified that McLaughlin ended up going down to the floor with N.T.

¶23. Unlike Felts, however, Dear stated that McLaughlin had appeared to be angry and had placed one of his arms across or around the area of N.T.'s throat. On cross-examination, opposing counsel asked whether Dear was alleging, or had ever alleged, that McLaughlin had choked N.T. In response, Dear stated, "I don't believe I've ever used the word choked, no." Dear emphasized several times during his testimony that he was not claiming McLaughlin had choked N.T. Dear also stated, "I don't recall ever saying that he [(McLaughlin)] was pressing hard." Although he had stated during his deposition that N.T. momentarily stopped screaming during the incident, Dear admitted at trial that the momentary pause could have been due to "shock or anything that would have caused her to silence her holler" rather than to being choked.

¶24. Dear testified at trial that he had previously worked at other places where a person displayed combative behavior and needed to be restrained. He therefore agreed that the environment at Cares and dealing with behavioral issues such as those displayed by N.T. were not new to him and did not shock him. Even though Dear had stated in his deposition that N.T. screamed as though "she was being murdered," he admitted at trial that he did not physically or verbally attempt to intervene when he witnessed McLaughlin restrain N.T. Dear further admitted that after returning to his classroom, he chose to make an audio recording of N.T.'s screams rather than seeking help from another Cares employee, calling 911, or otherwise reporting the incident at that time. Dear further testified that the other students in his classroom remained calm during N.T.'s screaming and that when one student asked about the screams, a second student replied that it was just N.T. Even though he testified that he was a mandatory child-abuse reporter, Dear admitted that he did not call the CPS hotline and report the incident until after he learned that Cares only intended to use him in the future on an as-needed basis. Dear testified, however, that it was only at that point that he became worried Cares would not properly investigate the incident.

¶25. After Dear rested his case-in-chief, Cares moved for a directed verdict under Rule 50(a). Cares argued Dear had failed to establish that an actual crime occurred and had failed to prove that his termination would not have happened but for his report of abuse. Upon consideration of the trial testimony and the parties' arguments, the circuit court found Dear had produced no credible evidence that McLaughlin's conduct amounted to child abuse. The circuit court further found the evidence had failed to credibly establish that Cares terminated

11

Dear due to his report of abuse. After concluding "that the matter [wa]s so overwhelmingly in favor of [Cares] that no reasonable juror could find for" Dear, the circuit court granted a directed verdict for Cares. Aggrieved, Dear appeals.

## STANDARD OF REVIEW

¶26. When dealing with a motion for a directed verdict, "[Rule] 50(a) requires the trial court to take a case from a jury and grant a directed verdict if any verdict other than the one directed would be erroneous as a matter of law." *Scott v. Neurosurgery Clinic PLLC*, 308 So. 3d 469, 474 (¶20) (Miss. Ct. App. 2020) (quoting *Malouf v. Evans*, 267 So. 3d 272, 276 (¶19) (Miss. 2019)). Only when "the evidence creates a question of fact [upon] which reasonable jurors could disagree" should the trial court "submit an issue to the jury." *Id.* (quoting *Butler v. Chadwick Nursing & Rehab. Ctr.*, 223 So. 3d 835, 841 (¶28) (Miss. Ct. App. 2017)). This Court reviews de novo the trial court's grant of a directed verdict motion. *Id.* In so doing, "[w]e view the evidence in the light most favorable to the non-moving party" and grant "all reasonable inferences" in that party's favor. *Id.* (quoting *Butler*, 223 So. 3d at 841 (¶28)).

## DISCUSSION

¶27. Recently in *Estate of Turner*, this Court analyzed issues similar to those now before us on appeal. As we explained in *Estate of Turner*,

> Mississippi adheres to the employment[-]at[-]will doctrine, which states absent an employment contract expressly providing to the contrary, an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible. However, our [Mississippi] Supreme Court has recognized a narrow public policy exception to the employment[-]at[-]will doctrine . . . .

12

*Estate of Turner*, 310 So. 3d at 1234 (¶18) (citations and internal quotation marks omitted).

¶28.   "Under *McArn v. Allied Bruce-Terminix Co.*, 626 So. 2d 603, 607 (Miss. 1993), and its progeny, an employee may sue [his] employer for damages if [he] is fired for reporting a criminal act of [his] employer or a fellow employee to [his] employer or anyone else." *Id.* at 1230 (¶1).   "[I]mportant limitations" apply, though, to "*McArn*'s exception for whistleblowers . . . ." *Id.* at 1234 (¶19).   The whistleblower exception only applies if the conduct at issue (1) "is actually illegal" and (2) "warrant[s] the imposition of criminal penalties, as opposed to mere civil penalties." *Id.* (emphasis omitted).   Thus, "a plaintiff's subjective belief that the acts [he] reported were illegal does not satisfy *McArn*." *Id.* (quoting *Gray v. Town of Terry*, 196 So. 3d 211, 218 (¶23) (Miss. Ct. App. 2016)).

¶29.   Here, Dear asserts that the incident about which he testified could reasonably be interpreted as either child abuse or simple assault.   With regard to child abuse, Mississippi Code Annotated section 97-5-39(2)(a) (Rev. 2020) provides in relevant part that "[w]hether bodily harm results or not," a "person shall be guilty of felonious child abuse" if he "shall intentionally, knowingly[,] or recklessly . . . [s]trangle, choke, smother[,] or in any way interfere with any child's breathing . . . ."   Even though Dear stated that McLaughlin placed an arm across or around the area of N.T.'s throat, he explained he was not claiming that McLaughlin had "press[ed] hard" on the area.   In addition, Dear reiterated multiple times during his trial testimony that he had never alleged, nor was he now alleging, that McLaughlin had choked N.T.   Moreover, although Dear had claimed during his deposition that N.T.'s screaming momentarily stopped, he stated at trial that the pause could have been

13

due to "shock or anything that would have caused her to silence her holler" rather than because of interference with her breathing.

¶30. As the only other eyewitness to the hold performed on N.T., Felts also offered no testimony that would support a claim of child abuse. Felts stated that she was in the timeout room the entire time McLaughlin was there and that she assisted McLaughlin with restraining and calming N.T. After the incident, Felts reported to Russum that McLaughlin had performed a proper MAB hold on N.T. In addition to providing no indication that McLaughlin ever interfered with N.T.'s breathing, Felts specifically testified at trial that McLaughlin never placed an arm across N.T.'s throat. Felts further testified that N.T. was neither harmed nor injured during the incident.

¶31. The record reflects that Dear produced no evidence during his case-in-chief to show that McLaughlin ever "[s]trangle[d], choke[d], smother[ed,] or in any way interfere[d] with" N.T.'s breathing. Miss. Code Ann. § 97-5-39(2)(a). In fact, Dear's own testimony tended to disprove McLaughlin engaged in any such conduct. We therefore find no merit to Dear's argument that McLaughlin's actions while performing the hold on N.T. could reasonably be interpreted as child abuse.

¶32. Dear also contends that the trial evidence could have supported a charge of simple assault. Mississippi Code Annotated section 97-3-7(1)(a) (Rev. 2020) states:

> A person is guilty of simple assault if he or she (i) attempts to cause or purposely, knowingly[,] or recklessly causes bodily injury to another; (ii) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or (iii) attempts by physical menace to put another in fear of imminent serious bodily harm . . . .

14

¶33. "An attempt to commit a crime consists of three elements: (1) an intent to commit a particular crime; (2) a direct ineffectual act done toward its commission; and (3) the failure to consummate its commission." *Kelly v. State*, 306 So. 3d 849, 855 (¶22) (Miss. Ct. App. 2020) (quoting *Brooks v. State*, 18 So. 3d 833, 841 (¶33) (Miss. 2009)). With regard to attempt,

> the supreme court has stated that "the act must be such as will apparently result, in the usual and natural course of events if not hindered by extraneous causes, in the commission of the crime itself, and an act apparently adapted to produce the intended result is sufficient to constitute the overt act essential to an attempt."

*Genry v. State*, 767 So. 2d 302, 311 (¶30) (Miss. Ct. App. 2000) (quoting *Gibson v. State*, 660 So. 2d 1268, 1270 (Miss. 1995)). "For purposes of [Mississippi's] . . . assault statute, 'serious bodily injury' means 'bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.'" *Griffin v. State*, 269 So. 3d 337, 349-50 (¶38) (Miss. Ct. App. 2018) (quoting *Rickman v. State*, 150 So. 3d 983, 986 (¶12) (Miss. Ct. App. 2014)).

¶34. Here, Dear offered no evidence at trial to establish any element of his simple-assault claim. Dear's testimony failed to establish that McLaughlin either attempted or actually caused any bodily injury to N.T. According to Dear's trial testimony, McLaughlin entered the timeout room and grabbed N.T. by her arm. In response, N.T. began to scream and tried to pull away from McLaughlin. As N.T. did so, Dear stated that N.T.'s arm twisted, and she ended up falling to the floor. Dear further stated that McLaughlin ended up going down to the floor with N.T. when she fell. The trial testimony reflected that after N.T. calmed down,

she and McLaughlin went to the school kitchen and ate a snack together. As previously stated, Felts testified that N.T. suffered no harm—much less any serious bodily harm—during the incident.

¶35. In addition, the testimony of both Dear and Felts clearly demonstrated that no one interfered with McLaughlin as he conducted the hold on N.T. Although Felts stated that she assisted McLaughlin after he and N.T. fell to the ground, neither she nor Dear ever tried to intervene in the situation. Thus, the record demonstrates that although McLaughlin possessed both the opportunity and ability to harm N.T. and that "no extraneous causes" hindered his actions, he never attempted to inflict any harm. *Genry*, 767 So. 2d at 311 (¶30). Moreover, the record is devoid of any testimony or evidence that McLaughlin ever sought "by physical menace to put [N.T.] in fear of imminent serious bodily harm . . . ." Miss. Code Ann. § 97-3-7(1)(a). We therefore conclude that this assignment of error lacks merit.

## CONCLUSION

¶36. Because we find Dear failed to produce sufficient credible evidence that McLaughlin engaged in criminal conduct, we find no error in the circuit court's grant of a directed verdict to Cares on this ground. We therefore affirm the circuit court's judgment.

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**

16