# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01313-COA

TAMMIE GARDNER                                                    APPELLANT

v.

WILLIAM DOTIE JACKSON, M.D., AND                              APPELLEES
MISSISSIPPI PREMIER PLASTIC
SURGERY PLLC

| | |
|---|---|
| DATE OF JUDGMENT: | 10/29/2020 |
| TRIAL JUDGE: | HON. JOHN H. EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN PRESTON SCANLON |
| | JERRY L. MILLS |
| | WILLIAM STACY KELLUM III |
| ATTORNEYS FOR APPELLEES: | H. WESLEY WILLIAMS III |
| | CHRIS J. WALKER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 09/13/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., WESTBROOKS AND LAWRENCE, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     On March 12, 2014, Dr. William Dotie Jackson performed a breast augmentation and mastopexy operation on Tammie Gardner.  After the surgery, both of Gardner's breasts became infected and ultimately had to be removed.  Gardner sued Dr. Jackson and Mississippi Premier Plastic Surgery PLLC for negligence and gross negligence.  During the trial, Gardner called Dr. Jackson and an expert witness to testify.  At the end of Gardner's case-in-chief, an attorney representing Dr. Jackson and Mississippi Premier Plastic Surgery PLLC moved for a directed verdict, arguing that Gardner had failed to provide an expert

witness who articulated the nationally accepted standard of care. The trial court granted the motion for a directed verdict in favor of both defendants. Gardner appealed, arguing that the evidence presented at trial established the nationally accepted standard of care and that, therefore, the trial court erred in granting Dr. Jackson's motion for a directed verdict. After reviewing the record and briefs, we affirm.

## FACTS

¶2.     On May 26, 2006, Gardner underwent a breast reduction, which Dr. Mark S. Elliot performed at Plastic Surgery of Meridian. Dr. Elliot used a superior pedicle[1] in his operation. On June 15, 2012, Gardner underwent an abdominoplasty and breast augmentation, which Dr. Elliot also performed. No complications arose from either surgery.

¶3.     On February 6, 2014, Gardner visited Dr. Jackson at Mississippi Premier Plastic Surgery. Gardner complained of pain in both of her breasts, asymmetry of the breasts, and hardening of her implants. Dr. Jackson recommended a breast augmentation and mastopexy.[2] In his pre-operative notes, Dr. Jackson wrote that he would use an inferior pedicle in his procedure. That same day, Dr. Jackson's office contacted Plastic Surgery of Meridian and requested Dr. Elliot's medical file on Gardner. While reviewing the file, Dr. Jackson discovered that Dr. Elliot had used a superior pedicle. Dr. Jackson read Dr. Elliot's notes,

---

[1] A "pedicle" refers to a surgical method where a surgeon leaves an attached tissue graft in the breast. The graft has nerves and blood vessels. The adjective, e.g., "superior," refers to the direction the incision is made. "Superior" means that the incision was made "medially from the chest" or "laterally from the axilla" (the shoulder). "Inferior" means the incision was made from below "where the chest meets the abdomen."

[2] A mastopexy is a breast lift.

2

which stated, "An area of the areola was de-epithelialized of skin, as well as the superior and medial pedicle skin . . . ." Dr. Jackson also stated that "[a]ccording to further reading in the op note, the breast tissue was removed inferiorly, laterally, and superiorly having a superiorly medially based dermoglandular pedicle . . . ."

¶4. According to Dr. Jackson, upon learning that information, he made a mental note to perform a superior pedicle during Gardner's surgery. Dr. Jackson never changed his initial pre-operative notes that stated "inferior pedicle."

¶5. On March 12, 2014, Dr. Jackson performed a breast augmentation and mastopexy on Gardner. On March 17, 2014, Gardner returned to Dr. Jackson's office for her first follow-up appointment. At that follow-up visit, Gardner told Dr. Jackson that she had a low-grade fever the night before, but after she took Tylenol, her fever subsided. Dr. Jackson noted that Gardner's breasts were swollen, Gardner's incisions were intact, and there was no drainage from the breasts. Additionally, no signs of infection were present.

¶6. March 24, 2014, Gardner returned for her next follow-up visit. Gardner told Dr. Jackson that she had a "blood blister" next to her right nipple. Dr. Jackson noted that Gardner had "no pus. No drainage. No complaints of pain in the area . . . . Everything was compressing as expected."

¶7. Gardner had another appointment scheduled for March 27, 2014. However, Gardner did not come to the appointment. On March 28, 2014, Gardner left a voicemail at Dr. Jackson's office, complaining of a fever and "pus-like" drainage from her left nipple. A text message summarizing the voicemail was sent to Dr. Jackson. He contacted Gardner and told

3

her, "I need to see you." However, Gardner did not want to travel from Meridian before the weekend, so she asked Dr. Jackson to write her a prescription for antibiotics. Dr. Jackson wrote the prescription and gave Gardner his contact information. He instructed her to come to his office on Monday.

¶8. On that Monday, Gardner arrived at Dr. Jackson's office. She was "very ill." When Dr. Jackson removed Gardner's dressing bra, he noticed pus and "dishwater"-like fluid coming from Gardner's left breast. Dr. Jackson rushed Gardner to surgery, where he operated on her left breast in an attempt to save her breast from requiring removal. Dr. Jackson, nevertheless, had to remove Gardner's left breast in a subsequent operation. After the removal of the left breast, Gardner's right breast started to show signs of infection, and after an additional surgery, Dr. Jackson removed Gardner's right breast as well.

¶9. On March 11, 2016, Gardner sued Dr. Jackson and Mississippi Premier Plastic Surgery PLLC for negligence and gross negligence. Specifically, she alleged that "Dr. Jackson . . . failed to perform the breast augmentation and mastopexy properly." A trial was held on October 5-6, 2020. At trial, Gardner argued that the nationally accepted standard of care for a breast augmentation and mastopexy was to use the same pedicle approach as previous surgeons. In this case, Gardner argued, that meant Dr. Jackson should have used a superior pedicle because Dr. Elliot had used a superior pedicle. Gardner alleged that Dr. Jackson incorrectly used an inferior pedicle, which resulted in a loss of blood flow to her breasts and the eventual removal of both breasts.

4

¶10.    To prove this standard of care, Gardner called Dr. Jackson as an adverse witness[3] and Dr. Carey J. Nease as an expert witness.  Dr. Jackson's testimony was extensive, but he never plainly stated the nationally accepted standard of care for a breast augmentation and mastopexy.  Dr. Jackson testified that "had [he] known [Gardner] had a prior superior pedicle, that would have been [his] plan" from the start.  Dr. Jackson agreed that in his deposition,[4] he had stated that "it's Plastic Surgery 101 . . . to maintain blood supply to the nipple-areola complex."  Dr. Jackson also agreed he had stated that "any plastic surgeon would know that."

¶11.    Dr. Nease testified as Gardner's expert witness at trial.  Dr. Nease stated that "[t]he decision to make about which pedicle [a surgeon is] going to utilize in a patient like Mrs. Gardner . . . [is] critically important" to preserve blood flow to the breast tissue.  Dr. Nease also testified that determining which pedicle to use on a patient, based on prior breast surgeries, is "the most important thing you have."  Dr. Nease explained that "pedicle planning is critically important," and not compromising blood flow to the breast is "one of the most basic things you teach."

¶12.    Dr. Nease also testified about the risks of failing to preserve the pedicle: "If you make too many cuts or leave the pedicle too narrow you can risk compromising the blood supply.  Or if there's been a previous surgery, then you can risk not having a great supply to begin with."  Dr. Nease agreed that "determining what pedicle was used previously is . . . the most

---

[3] Dr. Jackson was never offered as an expert witness for his testimony.

[4] Dr. Jackson's deposition was never entered into evidence.

important thing to determine in keeping blood supply on." When reviewing photographs of Gardner during her follow-up appointments, Dr. Nease described a photo showing "redness on the outside" of the nipple and "darkness" on Gardner's breast as a "potential problem."

¶13. Gardner's attorney elicited the following testimony regarding a pedicle selection:

> Q. And a violation of such a basic procedure that you learn that you teach, . . . would that be a major foul up?
>
> A. Definitely . . . . [I]t can result in what happened to Mrs. Gardner.
>
> Q. And would it rise to the level of being reckless in your opinion?
>
> A. I think you could say that.
>
> Q. And, in your opinion, did Dr. Jackson utilize the proper approach regarding the pedicle plan for a mastopexy?
>
> A. I don't believe.
>
> Q. And is your opinion given today to this court to a reasonable degree of medical certainty?
>
> A. Yes.

Dr. Nease also agreed that Dr. Jackson's "approach caused the ultimate tissue necrosis" in Gardner's breasts, but Dr. Nease was never asked to articulate the appropriate standard of care or determine if that standard of care was actually breached.

¶14. On cross-examination, Dr. Nease was asked, "Even if [Dr. Jackson] did the surgery exactly the right way, whatever that may be, [Gardner] still could have gotten the very same infections and had the very same end result that we have today. Isn't that true?" Dr. Nease responded, "It's possible." Dr. Nease was also asked if he agreed "there's always a risk for infection" with every surgery. Dr. Nease responded, "Yes." Finally, Dr. Nease was asked

6

the following: "[P]eople still get infections after surgery. . . [a]nd that doesn't necessarily mean the doctor did anything wrong, does it?" Dr. Nease replied, "Not necessarily."

¶15.　At the end of Gardner's case-in-chief, Dr. Jackson and Mississippi Premier Plastic Surgery PLLC moved for a directed verdict. Their attorney argued that Gardner had failed to provide an expert witness who "identif[ied] and articulate[d] the requisite standard of care that was not complied with" or that the alleged non-compliance "was the proximate cause or proximate contributing cause" of Gardner's alleged injuries. Gardner argued that her expert did not have to use the "magic words" "standard of care" to make a prima facie case. The trial court granted the motion for a directed verdict in favor of both defendants, finding that Gardner's expert never established the nationally recognized standard of care.[5]

¶16.　Gardner appealed, arguing "[t]he evidence presented at trial—including both the Plaintiff's expert's testimony, as well as the testimony of Defendant Dr. Dotie Jackson regarding 'plastic surgery 101' and what 'any plastic surgeon would know'—was sufficient to establish the nationally accepted standard of care and Plaintiff's prima facie case of medical malpractice," and "[t]he trial court committed error in entering its Order Granting Motion for Directed Verdict and Final Judgment of Dismissal with Prejudice, based on the lack of the use of 'magical words' in establishing the standard of care."

## STANDARD OF REVIEW

¶17.　This Court reviews a trial court's grant or denial of a motion for directed verdict de

---

[5] In its order granting the directed verdict, the trial court noted that during Gardner's examinations of Dr. Jackson and Gardner's medical expert, Dr. Nease, "there was no testimony establishing the objective, national standard of care applicable to a plastic surgeon performing an implant exchange and repeat mastopexy."

7

novo. *Parmenter v. J & B Enters. Inc.*, 99 So. 3d 207, 215 (¶13) (Miss. Ct. App. 2012).

## ANALYSIS

¶18. Gardner was required to prove the following in his negligence claim: "(1) a duty owed by [Dr. Jackson] to [Gardner]; (2) breach of that duty; (3) damages; and (4) that the breach was the proximate cause of the damages sustained by [Gardner]." *McGinty v. Grand Casinos of Miss. Inc.-Biloxi*, 245 So. 3d 555, 561 (¶19) (Miss. Ct. App. 2014).

¶19. For a plaintiff to properly establish the negligence of a physician, an expert witness must "articulate a specific, objectively-determined standard of care." *Est. of Northrop v. Hutto*, 9 So. 3d 381, 382, 384 (¶¶1, 9) (Miss. 2009). "Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 180 (¶12) (Miss. 2009) (quoting *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992)). "Absent expert medical testimony that articulates the duty of care a physician owes to a particular patient under the circumstances and identifies the particular point that the physician breached that duty and caused injury to the plaintiff, a plaintiff's claim for negligence must fail." *Stuart v. St. Dominic-Jackson Mem'l Hosp.*, 311 So. 3d 1192, 1202 (¶50) (Miss. Ct. App. 2020) (quoting *Potter v. Hopper*, 907 So. 2d 376, 380 (¶10) (Miss. Ct. App. 2005)). "The success of a plaintiff in establishing a case of medical malpractice rests heavily on the shoulders of the plaintiff's selected medical expert. Expert testimony in a medical negligence case must establish an 'objective' and 'nationally recognized' standard of care and a breach thereof."

8

*Butler v. Chadwick Nursing & Rehab. Ctr.*, 223 So. 3d 835, 841 (¶31) (Miss. Ct. App. 2017) (citation omitted).

¶20.    In *Braswell v. Stinnett*, 99 So. 3d 175, 178-79 (¶¶12, 14) (Miss. 2012), the Supreme Court determined that a trial court did not err in granting a motion for a directed verdict in a negligence claim against a dentist.  In that case, a plaintiff sued his dentist for negligence after his "face swelled to twice its normal size." *Id*. at 177 (¶3).  The plaintiff alleged that he suffered permanent damage to his mouth, nose, and speech. *Id*.  At trial, the plaintiff called an expert witness to testify. *Id*.  The expert revealed through testimony that he was not licensed to practice oral and maxillofacial surgery in any state, but the trial court accepted him as an expert anyway. *Id*. at (¶4).  At the conclusion of the trial, the dentist's attorney moved for a directed verdict, arguing that the expert was not qualified to give an expert opinion and that the expert failed to testify to the standard of care. *Id*. at (¶8).  The trial court granted the motion, and the plaintiff appealed.

¶21.    Upon review of the record, the Mississippi Supreme Court held, "A careful reading of [the expert's] testimony reveals that he established neither the requisite standard of care nor a breach of it." *Id*. at 178 (¶12).  The relevant testimony from that trial follows:

> A.    Generally you deposit your anesthetic two or three millimeters above the tooth if that's the purpose of what was going to happen that day, the scaling and the root plaining [sic]. All that is standard. To injure the nerve that's up here[,] one of two things has to happen. Either the dentist lost her orientation or she wasn't watching what [s]he was doing. There is no other way the needle could have been up there because that is not the standard of care. That is how the nerve was injured.
>
> . . . .

9

> Q. After reviewing your records . . . did you form an opinion as to whether or not [the dentist] breached her duty of care in the treatment of [the plaintiff]?
>
> A. Yes, I did.
>
> Q. What is that opinion?
>
> A. My opinion is she deviated from **good dental practice**.

*Id.* at 178-79 (¶12) (emphasis omitted) (emphasis added). The supreme court stated that "[t]his testimony falls far short of establishing the standard of care, and that Dr. Stinnett breached it." *Id.* at 79 (¶13). The court held, "Dentists are not required to do what is generally done, or what the average dentist would do. And **our law certainly does not require dentists to conform to a vague, subjective standard such as good dental practice**." *Id.* (¶14) (emphasis added). Rather, the court explained, Mississippi law requires that a plaintiff's expert witness establish "what is required of a minimally competent dentist." *Id.*

¶22. Here, Gardner failed to establish the nationally accepted standard of care. Dr. Nease's testimony never "articulate[d] a specific, objectively-determined standard of care." *Hutto*, 9 So. 3d at 382 (¶1).[6] Dr. Nease explained that choosing the proper pedicle is "critically important" to preserve blood flow to the breast tissue but never articulated that choosing the wrong pedicle was a breach of a known and accepted duty or that the breach proximately caused the infection that allegedly caused Gardner to lose her breasts. He testified that not

---

[6] While not outcome determinative, it is important to note that the words "standard of care" were never spoken until Dr. Jackson's motion for a directed verdict. Those words were never asked to the expert witness, nor did Dr. Nease ever use those words in relaying an answer.

compromising blood flow to the breast is "one of the most basic things you teach." He also stated that Dr. Jackson's failure to use the proper pedicle is what caused the necrosis in Gardner's breast tissue. While that opinion may offer evidence as to causation, Dr. Nease never defined the standard that Dr. Jackson allegedly breached. Dr. Nease explained the importance of pedicle selection, but his testimony was too vague to establish a nationally recognized standard of care. Dr. Nease never explicitly stated the nationally accepted standard of care. Because Gardner failed to present expert testimony that established an objective, nationally accepted standard of care, she failed to make her prima facie case.

## CONCLUSION

¶23. For the reasons stated above, we find that the trial court did not err in granting Dr. Jackson and Mississippi Premier Plastic Surgery PLLC's motion for a directed verdict based on Gardner's failure to properly establish the national standard of care through expert testimony.

¶24. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**

11